[No. 27322. *En Banc.* September 28, 1939.]

FRANCES L. KELLER, *Respondent,* v. THE CITY OF SEATTLE, *Appellant.*[1]

[1]Reported in 94 P. (2d) 184.

574

BLAKE, C. J., MAIN, and MILLARD, JJ., dissent.

*A. C. Van Soelen* and *C. V. Hoard,* for appellant.

*Hare, Turner & Maurier,* for respondent.

ROBINSON, J.—Mrs. Keller, as plaintiff, recovered a jury verdict against the city of Seattle with respect to injuries alleged to have been suffered by reason of the negligent operation of a municipal street car. On appeal, the city contends that the trial court erred in denying its challenge to the sufficiency of the evidence, in denying its motion for judgment notwithstanding the verdict, and in giving instruction No. 14. It prays, in the alternative, that the cause be dismissed or a new trial ordered.

Mrs. Keller received her injuries on September 14, 1937. On the following September 30th, she filed her

statutory claim against the city, describing the occurrence, in part, as follows:

"Claimant was seated on left front seat of said car of the seats running crosswise thereof. The said car stopped at said intersection, and while the car was so stopped, claimant rose from her seat and proceeded toward the front end of said car for the purpose of getting off at the next intersection, to-wit: Broadway and James street. While claimant was so proceeding, the operator of said street car carelessly and negligently started said car with a sudden, violent and unusual jerk, causing claimant to lose her balance and throwing her with great force and violence against the seat on the right side of said car, and the passengers sitting thereon, and against the floor, causing the injuries and damage hereinafter set forth."

In the complaint, personally verified by her, under oath, on January 19, 1938, Mrs. Keller alleged:

"Plaintiff was seated on the left front seat which was placed crosswise of said car. At the time, there were other passengers on the car, some of whom were standing. The said car stopped at said intersection, and while the car was so stopped, plaintiff rose from her seat and proceeded toward the front end of said car for the purpose of getting off at the next intersection, to-wit: Broadway and James street. While plaintiff was so proceeding, the operator of said street car carelessly and negligently started said car with a sudden violent and unusual jerk, causing plaintiff to lose her balance and throwing her with great force and violence against the seat on the right side of said car, and the passengers sitting thereon, and against the floor, causing the injuries and damage hereinafter set forth."

On April 21, 1938, Mrs. Keller, in giving a deposition under oath, testified several times, very definitely, that she arose from her seat while the car was stopped at the intersection of Broadway and Cherry streets to allow passengers to alight, and that she had gotten

to her feet with the idea of getting off at the next street and was standing when the car started with a jerk which caused her to fall.

"Q. Will you describe in your own words just how it happened? A. I wanted to get off at James street. I had to get up to get off the car; and just as I got up and took a step, why,—a couple of steps, perhaps, the car jerked and threw me. Q. Was the car stopped when you got up? A. When I got up? Q. Yes. A. Yes. Q. It was stopped at Broadway and Cherry— A. Yes, somebody got off. Q. And you were standing when it started? A. Yes, I got up— Q. You were standing when it started? . . . Q. Was it jerking more than cars usually do when they start up? A. Well, it jerked, yes. Q. Was it worse than they usually jerk when they start up? Was this worse than the usual jerk when they start up? A. Yes, it was quite a jerk. Q. Well, that does not answer the question. I asked you, was it worse than usual, the jerk, when cars start up? A. Well, it must have been to throw me, to give me such a hard blow, throw me so far. Q. Did you notice it at the time? A. Yes, I noticed it at the time, that it was hard, because it hurt me. Is that what you mean? Q. Well, I want you to describe it just as well as you can. A. Well, it just threw me. It all happened in a minute. Q. You see that this jerk is very important both from your standpoint and mine too, and I wanted you to describe it as fully as you could. A. Well, I just got up and took a few steps, and it gave a big jerk. It must have been a terrible jerk to knock me down and throw me so hard."

This testimony, it will be noted, is entirely consistent with the claim Mrs. Keller filed with the city, and also with her complaint in this action.

At the trial, Mrs. Breen, a frequent passenger on that line, was the first witness called. She was standing in the aisle, holding to the back of the third, left, transverse seat. She testified, very positively, that there was a jerk when the car started, after allowing

passengers to alight at Cherry street. This jerk threw her backward. At that time, Mrs. Keller was still seated. After the car had started, plaintiff, Mrs. Keller, arose to get off, and there was another jerk, as if the brakes had been applied suddenly, swinging Mrs. Breen forward. This was the jerk which caused Mrs. Keller to fall.

Mrs. Belarde, a sister of Mrs. Breen, was the next witness called. She also testified that the car had stopped and was again under way when the jerk occurred which caused Mrs. Keller to fall.

The plaintiff, on being called after these two witnesses had testified, abandoned the story she had told in her claim to the city, and in her complaint, and in her deposition of April 21st, to the effect that she fell when the car jerked in starting up after the Cherry street stop, and testified as Mrs. Breen and Mrs. Belarde had done, saying, in part:

"The car stopped at Cherry street to let off people— someone, and then *after it started* I got up and started toward the forward end of the car and then it gave a lurch, a very strong lurch, and threw me with great force up against the seat and the people on the right hand side of the car."

██ In connection with this shifting of ground on the part of the plaintiff, two contentions are made: First, that there is a variance between the claim filed with the city and the case made in court, in that Mrs. Keller alleged, in her claim, that she was injured by a starting jerk after a stop at an intersection, while her evidence showed a stopping or decelerating jerk after the car was on its way. There is no merit in this contention, since the claim gave sufficient notice of the time, place, and general nature of the alleged accident. *Wagner v. Seattle*, 84 Wash. 275, 146 Pac. 621, Ann. Cas. 1916E, 720. Second, that Mrs. Keller's

conduct, in so readily shaping her testimony to make it conform to that given by Mrs. Breen and Mrs. Belarde, after having three times sworn, under oath, that she fell because the car jerked in starting, after discharging passengers at Cherry street, shows that she is wholly unworthy of credit. Obviously, that circumstance affected her credibility. But credibility is a matter for the exclusive consideration of the jury. In our present inquiry, we are not only required to treat the testimony given by Mrs. Keller, or on her behalf, as true, but we must also give her the benefit of every favorable inference which can be drawn from it.

■ As the plaintiff herself said, in giving her testimony, "There are more or less jerks on any car." The question presented by the two assignments of error relating to the merits is: Was there evidence that the alleged jerk was so unusual and violent that reasonable men might, in the absence of any explanation of its cause, infer that it was brought about by some negligent act or omission?

The evidence relied upon to show negligence is found wholly in the testimony given by Mrs. Breen, Mrs. Belarde and the plaintiff. In her direct examination, the plaintiff characterized the alleged jerk as "a very strong lurch." In her cross-examination, she testified as follows:

"Q. How did it jerk; as if the brakes had been suddenly applied? A. I could not say, it just came like that and I could not say what kind of a jerk it was. It was a very violent jerk. It threw me to my knees. Q. It did not swerve from left to right, did it? A. I could not say that. Q. You could not say; you did not know what kind of a jerk it was? A. It was a very violent jerk. It threw me forward."

Mrs. Breen, on direct examination, testified as follows:

"Q. How would you describe this particular jerk when Mrs. Keller fell? A. Well, it was very forceful or violent; that is about the best I could say."

She further testified that she might have fallen herself if she had not been holding to a seat. On cross-examination, she said that the car did not sway, and continuing:

"Q. You say it swung you around. Did it throw you forward or backward? A. It did not throw me clear around because I braced myself, but it did swing me forward. Q. It swung you forward as if he put on the brakes suddenly; is that right? A. That is the impression I had of it."

Mrs. Breen also testified that the operator of the car was a more "jerking" driver than any other on that line.

Mrs. Belarde testified to the same effect, and, as to the jerk in question, she said that it was the most severe that she had ever experienced while riding in a street car. She further testified:

"Q. Did you feel the jerk? A. Yes, I did. Q. What happened when you felt the jerk? A. Well, I was thrown forward and my hat knocked to the back of my head. Q. How far forward? A. Well, far enough that I bumped my knees and I hit my hat on the person in front of me. Q. You bumped your knees, I presume on the back of the seat in front of you? A. Yes."

Upon cross-examination, she further testified:

"Q. Was anybody else thrown forward in the seat? A. I did not notice. I was busy, I did not notice. My hat was thrown forward. . . . Q. Were your knees bruised? A. I could not say they were bruised, but they did get a sharp bump."

The appellant, in urging that no case was made for the jury, relies upon the opinion in *Wade v. North Coast Transportation Co.*, 165 Wash. 418, 5 P. (2d)

985, cases cited in that opinion, and other cases of a similar nature. In that case, a suitcase fell from a parcel rack near the top of a bus, when the vehicle was turning a corner, and injured a little girl. Witnesses testified that the bus was going "quite fast;" that there was a sudden "lurch and jerk;" that the bus "lurched;" and that passengers standing in the aisle were thrown over against people sitting in the seats. One witness testified:

" 'Q. Did you feel the manner in which he was turning into that street? Did you notice it? A. It was impossible for me to stay in the seat; I was not thrown out of the seat. Q. What did it do to you? A. Oh, just sort of—I sort of left the seat.' "

It will be noted that the testimony of this witness was somewhat indefinite. The court sustained the action of the lower court in granting a motion for judgment notwithstanding the verdict.

We will not review the great number of other cases which appellant cites. The case of *Endicott v. Philadelphia Rapid Transit Co.*, 318 Pa. 12, 177 Atl. 17, is fairly typical, and is, at least, as favorable to the appellant as any other it has cited. We quote from that decision:

"Testifying in her own behalf, plaintiff stated that she boarded defendant's trolley car, carrying an umbrella and a small bag containing groceries; that there were no empty seats; that after the car started another passenger offered her a place at the front end of the 'long bench that [ran] lengthwise of the car' on the right-hand side; that she 'took hold of the iron bar' in front of the seat and 'sat down right away, and the car gave a terrible, terrific jolt' and stopped 'very suddenly,' and she fell to the platform, suffering the injuries for which she sought recovery. She testified further that as she fell she saw men in front of her 'twirling around on the straps,' and 'people on the seats pushing forward against the others.' Another

witness stated that there was a 'sudden and violent stop,' a 'jerk, sudden, very sudden,' that the passengers who were seated 'jostled up against each other,' and that he 'whirled around' on the strap to which he was holding. This was the whole of plaintiff's case. . . .

"Accepting as true plaintiff's evidence as to how the accident happened, we are required to determine whether it is sufficient to show that the car was operated in a negligent manner. In a long line of decisions, recently reviewed by us in *Smith v. Pgh. Rys. Co.*, 314 Pa. 541, this court and the Superior Court have held that statements that a street car 'started violently,' 'started with a violent jerk,' 'started with a sudden, unusual, extraordinary jerk,' 'stopped with a jerk,' 'came to a hard stop,' 'started up all of a sudden, with an awful jerk, and stopped all of a sudden,' and the like, are not of themselves sufficient to show negligent operation of the car, but that there must be evidence inherently establishing that the occurrence was of an unusual and extraordinary character, or evidence of its effect on other passengers sufficient to show this. . . .

"The fact that several passengers who were standing 'whirled around' or 'twirled around' on the straps cannot be said to be sufficient to show an extraordinary jolt or jerk of the car. A happening of this kind is such a commonplace that it seldom attracts attention. Likewise, the testimony that the passengers on the side seats (and it is clear that those are the ones referred to) 'pushed forward' or 'jostled up' against each other does not show that the stop was of an unusual or extraordinary nature."

We agree with the appellant that the cases sustain its contention as to the testimony given by the plaintiff herself, and by Mrs. Breen, but we do not hold that view as to the testimony given by Mrs. Belarde. It is to be remembered that the car had stopped at the intersection where jerks might be expected to occur in stopping and starting, and was proceeding on its way when this jerk or jolt happened  In our

opinion, reasonable men might well believe from Mrs. Belarde's testimony that this jerk was something more than the ordinary jolt or jerk incident to transportation, especially since it occurred when the car was traveling between intersections; and that, in the absence of any explanation on the part of appellant, it laid the foundation for a logical inference that its servant did not exercise that high degree of care which the law imposes upon carriers of passengers; or, to put the matter more briefly, that there was sufficient evidence, in the words of the *Endicott* case, "of its effect on other passengers" (Mrs. Belarde), to warrant such an inference.

Defendant made no attempt to explain the accident, but such defense as it attempted was wholly directed toward showing that it did not happen. Mrs. Keller had alleged that she fell at about 4:45 p. m., and her testimony, and that of her witnesses, was to the effect that the incident occurred either a few minutes before, or a few minutes after, five o'clock. Defendant offered evidence to the effect that none of its employees had reported the accident, as required by its strictly enforced rules requiring reports of all accidents in or about their cars, and supplemented this by calling the five motormen who operated the five cars which went over the line, outward bound, between 4:45 and 5:17. Each of them testified that, to the best of his knowledge, no such accident happened on his car.

■ Appellant contends that the court erred in giving instruction No. 14, which reads as follows:

"If you find that the plaintiff was a passenger on defendant's street car, and that she was injured by virtue of the manner in which the defendant operated the car, then I instruct you that there is a presumption that plaintiff's injury was caused by negligence of the defendant, and the burden of proof is then on the defendant to show that it was not negligent."

Immediately after the jury retired, counsel for the city read this instruction to the court, and, excepting to it, said:

"I think that is entirely too broad, because the burden is on the plaintiff to establish actual negligence on the part of the defendant before she can recover.

"Under this instruction if she was injured by reason of an ordinary jerk or ordinary going around the curve by the car, no matter if it was operated in the most careful manner possible, it would then transfer the burden of proof from the plaintiff to the defendant, and I do not think that is the law."

The instruction was clearly erroneous, for the reasons stated in the exception. Respondent insists that the instruction is correct, on the ground that it is an exact paraphrase of an instruction approved in *Firebaugh v. Seattle Electric Co.*, 40 Wash. 658, 82 Pac. 995, 111 Am. St. 990, 2 L. R. A. (N. S.) 836. But, in a later case in which a plaintiff seeking to recover with respect to injuries directly caused by the jerking of a cable car relied upon the *Firebaugh* case and the doctrine of *res ipsa loquitur*, as the respondent does here, the court said:

"The accidents in *Firebaugh v. Seattle Elec. Co.*, 40 Wash. 658, 82 Pac. 995, 111 Am. St. 990, 2 L. R. A. (N. S.) 836; *Williams v. Spokane Falls & Northern R. Co.*, 39 Wash. 77, 80 Pac. 1100, and *Anderson v. McCarthy Dry Goods Co.*, 49 Wash. 398, 95 Pac. 325, 16 L. R. A. (N. S.) 931, were of such a character as, in the light of ordinary experience, were explainable from the standpoint of the plaintiff by the presumption of negligence only. Each and all of them were unusual, not to be ordinarily anticipated, and inconsistent with the idea of careful operation. No such showing is made in this case, the undisputed evidence being that jerks of a cable car are of ordinary occurrence, consistent with careful operation, and that they frequently happen without any act of negligence upon

the part of the carrier." *De Yoe v. Seattle Electric Co.,* 53 Wash. 588, 102 Pac. 446, 104 Pac. 647, 1133.

In this case, the undisputed evidence is that jerks of an electric car are of ordinary occurrence, consistent with careful operation, and that they frequently happen without any act of negligence on the part of the carrier.

Respondent says, in her brief, that:

"The rule is stated in 10 C. J. 1030, § 1429, as follows:

" 'Sudden Jerks or Sudden or Premature Starts. As to injuries resulting from the sudden movement of a train or car, causing a jerk or jolt, the burden of proving which is on plaintiff it has been held that the fact of the jerk or jolt itself, *when proved as being unusual or extraordinary in its nature,* is *prima facie* evidence of negligence, the burden then being on defendant to show freedom from negligence on its part; and it is not necessary for plaintiff to go further and to show that the jerk or jolt was not in the course of the ordinary operation of the road; but the presumption of negligence becomes conclusive unless it is shown that the jerking or jolting of the car was unavoidable in the exercise of the highest degree of care. . . .' " (Italics ours.)

But the obvious answer to that is that the instruction complained of did not restrict the matter to a jerk and jolt, "unusual or extraordinary in its nature." The jury was instructed that there was a presumption of negligence if the plaintiff was injured "by virtue of the manner in which the defendant operated the car." That included all operating jerks and jolts.

Most of the cases cited by respondent contain language similar to that approved and quoted in the *Firebaugh* case from Elliott on Railroads:

" 'It is, therefore, too broad a statement of the rule to say that, in all cases, a presumption of negligence on the part of the carrier arises from the mere happening of the accident or an injury to a passenger regard-

less of the circumstances and nature of the accident. The true rule would seem to be that when the injury and circumstances attending it are so unusual and of such a nature that it could not well have happened without the company being negligent, or when it is caused by something connected with the equipment or operation of the road, over which the company had entire control, without contributory negligence on the part of the passenger, a presumption of negligence on the part of the company usually arises from proof of such facts, in the absence of anything to the contrary, and the burden is then cast upon the company to show that its negligence did not cause the injury.' "

But this accident was not of such a nature that " 'it could not well have happened without the company being negligent.' " It is a matter of common knowledge that a motorman, while operating his car between stops, is often confronted with dangers which require the sudden setting of brakes, such as a jaywalking pedestrian, a child running into the street after a ball, an automobile or truck going in the same direction suddenly pulling over into the middle of the street or suddenly veering so close to the track as to make a collision probable.

This action was wholly based upon the theory that the respondent plaintiff was injured by the careless manner in which the car was operated. The original allegation of negligence was:

". . . the operator of said street car carelessly and negligently started said car with a sudden, violent and unusual jerk, . . ."

When it appeared from the evidence that the plaintiff did not fall when the car started, but when it decelerated between street intersections, she asked and obtained leave to amend by adding the words "and operated" after the word "started." They were interlined in the complaint and initialed by the trial judge.

The question which the case presented to the jury was: Was the car "operated" in a careless and negligent manner? The plaintiff, of course, had the burden of proving that it was. The members of the jury were, however, instructed that, if they found that plaintiff "was injured by virtue of the manner in which the defendant operated the car," the burden was on the defendant to show that it was not negligent, and so, the jury was authorized to find for the plaintiff without proof that the car was negligently operated; for it is entirely possible that the plaintiff may have fallen on account of an ordinary operating jerk. In other words, under the instruction complained of, the jury was authorized to presume that the car was negligently operated because the defendant did not prove that it was not.

While strenuously insisting that the giving of instruction No. 14 did not constitute error, the respondent insists that, if it did, the error was harmless, since the jury was told, in instruction No. 9, that the defendant would not be liable for ordinary jerks and jolts; and further, because it was stated generally, in other instructions given, that the plaintiff must prove negligence. We have frequently held that the giving of a technically erroneous instruction does not constitute prejudicial error, when, upon considering the instructions as a whole, it can be fairly said that the error was cured by some other instruction. But all holdings of that kind depend upon the particular circumstances presented. Here, the result of the action wholly depended upon the question as to whether or not the motorman operated the car in a negligent manner. The evidence tending to prove that he did was not very convincing and, indeed, was barely sufficient to carry the case to the jury.

■ It was contended throughout the case that the rule of *res ipsa loquitur* applied. The respondent concedes that the instruction complained of is a *res ipsa loquitur* instruction. Her brief contains a subdivision in defense of it, headed: "B. The Instruction on Res Ipsa Loquitur Was Properly Given." In a supplemental memorandum filed since the argument *En Banc*, that contention is still stoutly maintained. Being of the opinion that the doctrine of *res ipsa loquitur* applied and having procured the court to so instruct, it is but reasonable to suppose that respondent's counsel urged that theory in his argument to the jury. The doctrine of *res ipsa loquitur* is, obviously, directly contrary to the rule that a plaintiff is required to prove negligence. It dispenses with such proof on his part and throws the burden upon the defendant to disprove negligence.

Upon these considerations, we think that we must dispose of the case as a similar case was disposed of in *Denver & R. G. R. Co. v. Fotheringham,* 17 Colo. App. 410, 68 Pac. 978. In that case, the plaintiff alleged that she was thrown and injured by sudden jerking of a railroad car. The trial court instructed the jury on the theory of *res ipsa loquitur.* Upon appeal, the reviewing court said,—the first sentence referring to the *res ipsa loquitur* instructions:

"They authorized the jury to presume negligence from the fact of the accident. It is true that the court elsewhere gave an instruction that the burden was upon the plaintiff to prove the negligence of the defendant; but it could not undo the mischief it had occasioned, by merely contradicting itself. It did not belong to the jury to say in which of the court's irreconcilable declarations it was right, and in which it was wrong; nor is it possible for us to know which they followed.

"The judgment must be reversed."

The judgment appealed from is reversed, and the trial court is ordered to grant the defendant's motion for a new trial.

BEALS, JEFFERS, STEINERT, SIMPSON, and GERAGHTY, JJ., concur.

MAIN, J. (dissenting).—I agree that instruction No. 14 does not contain a correct expression of the law, and I am in accord with the law as stated in the majority opinion. There remains, however, the question of whether, even though instruction No. 14 was erroneous, it was prejudicial. In view of the evidence that was introduced and the giving of instruction No. 9, wherein the jury were definitely told that there was no liability for injuries caused by ordinary jolts or jerks, I am unable to see how the jury could have been misled by instruction No. 14. It is my view that the instruction, even though erroneous, was not prejudicial.

I think the judgment should be affirmed.

BLAKE, C. J., and MILLARD, J., concur with MAIN, J.