[No. 30607. Department Two. March 14, 1949.]

FREDERICK A. WILCOXEN et al., Respondents and Cross-appellants, v. THE CITY OF SEATTLE, Appellant.[1]

[1]Reported in 203 P. (2d) 658.

*A. C. Van Soelen* and *C. C. McCullough,* for appellant.

*Koch & Morgan,* for respondents and cross-appellants.

ROBINSON, J.—This is an appeal and cross-appeal from a judgment entered upon the jury verdict for the plaintiffs in an action for damages with respect to injuries suffered by Frederick Wilcoxen as the result of a fall on a Seattle city bus.

On August 10, 1946, respondent, Frederick A. Wilcoxen, was a paying passenger on a city bus which was being operated by an agent of the city of Seattle in a northerly direction on Greenwood avenue, in the vicinity of an in-

tersection of North 71st street. The situation there can be briefly described as follows: North 71st street enters Greenwood avenue from the east. Some distance north of the intersection, there is a driveway leading into a parking lot adjacent to, and operated by, a Safeway store, which is immediately to the north of the parking lot. Just north of the driveway, and running in front of the Safeway store, there is a scheduled bus zone.

As the bus approached the intersection of North 71st street, Mr. Wilcoxen arose and gave the customary bell signal to be let off in the next zone. The bus driver slowed down, preparatory to moving into the zone, but suddenly, in order to avoid an automobile which had turned in front of him to enter the driveway, brought his vehicle to a halt. The force of the stop threw Mr. Wilcoxen to the floor of the bus, in consequence of which, as alleged in his complaint, he sustained injuries and bruises to his head, limbs, and body; suffered from a post-traumatic myo-fascitis of the posterior cervical and erector spinal muscles, defined in the medical testimony as a combination of an acute strain to the muscles of the head and back and a chronic muscular rheumatism; and further suffered from severe and continuing head pains. He also alleged that, as a direct and proximate result of the accident, his recovery from a previous surgical operation for varicose veins in both legs was retarded, with resultant pain and suffering; and his wife, who was joined in the complaint, claimed special damages in consequence of loss of consortium and services of her husband, resulting not only from his physical injuries, but from a marked change in his personality and general behavior alleged to have been brought about as a result of the accident.

Complaint was brought against the city of Seattle, with Hiram Leavitt, alleged to be the operator of the automobile involved, and his wife, joined as defendants. At the trial, appellant city seasonably moved to challenge the sufficiency of respondents' evidence, which motion was denied by the court. The jury rendered a verdict in favor of respondents and against the appellant city in the sum of $2,425. After

denying appellant's subsequent motion for judgment notwithstanding the verdict or, in the alternative, for a new trial, the court entered a judgment for the sum of two thousand dollars.

On appeal, the city contends that the trial court erred in denying its challenge to the sufficiency of the evidence, in denying its motion for judgment notwithstanding the verdict, and in denying its motion for a new trial. Respondents contend, on cross-appeal, that the trial court erred in modifying the verdict as rendered by the jury. Defendants Leavitt, who were exonerated by the jury, have no further concern with the action.

The negligence charged in the complaint was as follows: (1) The operator of the bus stopped his vehicle suddenly, abruptly, and violently, thereby causing it to lurch and sway about; and (2) that the operator of the bus failed to keep his vehicle under proper control.

In considering the city's assignment that the trial court erred in refusing to enter judgment in its favor notwithstanding the verdict, it is incumbent upon us to keep in mind the well-established rule that, in passing upon a motion for judgment notwithstanding the verdict, we must not only accept as true all competent evidence in the record favorable to respondents, but must give them the benefit of every favorable inference which may be reasonably drawn from such evidence. *Vercruysse v. Cascade Laundry Co.*, 193 Wash. 184, 74 P. (2d) 920; *Keller v. Seattle*, 200 Wash. 573, 94 P. (2d) 184. A motion for a judgment notwithstanding the verdict involves no element of judicial discretion. *Wiggins v. North Coast Transp. Co.*, 2 Wn. (2d) 446, 98 P. (2d) 675.

It is the general rule that such jerks or jars as are necessarily incident to the use of the conveyance and are not the result of negligence, will not render the carrier liable for resulting injuries. *Wade v. North Coast Transp. Co.*, 165 Wash. 418, 5 P. (2d) 985. As we said in the *Wiggins* case, *supra*:

"The ordinary jolts and jerks of the bus in starting or stopping are among the usual incidents of travel; and for injuries resulting from them, the carrier is not liable."

It is, however, actionable negligence to cause a conveyance to give a violent or extraordinary jolt, causing injury to a passenger. *Cassels v. Seattle*, 195 Wash. 433, 81 P. (2d) 275. Whether a given jerk or jolt was "violent" or "extraordinary" or "usual" is ordinarily a question of fact to be determined by the jury. *Wiggins v. North Coast Transp. Co., supra.*

In *Keller v. Seattle, supra,* we considered the problem of under what circumstances the evidence that a jerk has been violent or unusual is sufficient to carry a case to the jury. In that case, we quoted the following from *Endicott v. Philadelphia Rapid Transit Co.*, 318 Pa. 12, 177 Atl. 17:

" 'Accepting as true plaintiff's evidence as to how the accident happened, we are required to determine whether it is sufficient to show that the car was operated in a negligent manner. In a long line of decisions, recently reviewed by us in *Smith v. Pgh. Rys. Co.*, 314 Pa. 541, this court and the Superior Court have held that statements that a street car "started violently," "started with a violent jerk," "started with a sudden, unusual, extraordinary jerk," "stopped with a jerk," "came to a hard stop," "started up all of a sudden, with an awful jerk, and stopped all of a sudden," and the like, are not of themselves sufficient to show negligent operation of the car, *but that there must be evidence inherently establishing that the occurrence was of an unusual and extraordinary character,* or evidence of its effect on other passengers sufficient to show this.' " (Italics ours.)

Now, it is true that the testimony as to the effect of the stop on other passengers does little to support plaintiffs' contention that the stop was of an unusual or extraordinary nature. About the strongest testimony to this effect was delivered by Mr. C. S. Stanhope, who testified as follows:

"A. Well, just after we passed 71st, the bus gives a sharp lunge, or stopped real quick, and . . ."

And later:

"Q. Going back to this time, the bus stopped, can you describe that stop? I think you did to some extent, but

there are all kinds of stops. What kind was this one? A. It was a very sudden stop. Q. You were sitting down, I believe? A. Yes, I was sitting down. Q. Did it disturb you in your seat? A. Oh, well, it would jar you all right."

 Such testimony, in itself, would be insufficient to establish the extraordinary character of the jerk. However, we think that there is ample evidence in the testimony of the various witnesses as to the effect the stop had on Mr. Wilcoxen to raise a question of fact on the matter, properly to be determined by the jury. The record presents evidence indicating that Mr. Wilcoxen was seated near the center exit of the bus when he rose to get off at this exit. He was turning around, and, before he could grasp a handle, he "went up in the air, and down," staggering or sliding, and rolling toward the front of the bus, at least as far as the second cross-seat, where the witness, Mr. Stanhope, was sitting, bumping his head and leaving him somewhat dazed, so that he had to be helped to his home. From this testimony, it seems that there was sufficient evidence from which the jury could find, in the words of the *Endicott* case, *supra,* that the occurrence was "of an unusual and extraordinary character," indicating negligent operation of the bus; and this is particularly true where, as here, and as in the *Keller* case, *supra,* the stop occurred while the car was traveling between intersections.

We think that the evidence in the case establishes, beyond reasonable doubt, that the bus driver stopped the bus suddenly, in order to avoid plunging into an automobile which showed up directly in his path, as he was necessarily crossing the roadway into the parking lot in order to stop his bus in the bus zone just north of the roadway. The driver himself so testified. Stanhope, a witness for the plaintiffs, testified regarding that matter, as follows:

"Q. Just tell what happened that attracted your attention first. A. The stop stopping suddenly. Q. What did you do? A. Well, what do you mean? I want to know what— Q. (Interposing) I am trying to step by step get a description of what happened that you saw. I didn't want you to go too fast, but if you can go ahead and tell us what happened from then on, go ahead. A. Well, the bus stopped suddenly, and

of course I looked, just as I — in front of the bus there was a car at right angles headed to the right. Q. What direction would that be? A. Well, it would have — going east. It would be headed east. Q. How far ahead of the bus was this car? A. Just a few feet. I wouldn't say exactly, but it was very close. Q. I am trying to place that car as exactly as I can now. Was it at an angle or was it exactly straight across the street? Just how was it? A. It was practically across the street. Q. Was it stopped or was it in motion? A. No. It was in motion. Q. What rate of speed, if you can say? A. The automobile, you mean? Q. Yes. A. I couldn't tell that. It wasn't going fast, but I couldn't say because it was going in to a parking lot. Q. What happened after you observed this car? A. Well, that is when the old gentleman fell. Q. Where was he with respect to you? A. He was back of me, but when he fell he was almost at my left in the aisle. Q. You were near the front of the bus, is that correct? A. I was pretty well, not clear in the front, but I was in the front half. Q. What did you do then? A. I picked the old gentleman up."

Mrs. Genevieve Rhyne, called on behalf of the defendant city, testified that she was a passenger on the bus when the accident occurred, seated next to the aisle in the second seat from the front on the left side. She further testified, in part, as follows:

"Q. Now, do you remember the bus coming to a stop there prior to reaching 71st or 72nd Street? A. Yes, I do. Q. And just prior to the bus stopping, had you seen an automobile anywhere? A. Yes, I did. Q. Where was it when you first saw it? A. I seen it crossing right in front of the bus as it went to cross the bus, the bus driver jerked the bus back so he wouldn't hit them. Q. The bus driver stopped? A. Yes. Q. Was this automobile, — what distance away from the front end of the bus would the side of the automobile be when you first saw it? A. Well, I should say about three or four feet. Q. About three or four feet? A. Yes. Q. And can you give the jury any idea about how fast this bus was traveling at that time? A. He wasn't traveling very fast because he was getting ready to stop. Q. Had you heard, by the way, — had you heard the buzzer ring or sound rather, I guess the buzz rather than sound, if there is such a distinction; had you heard it or not? A. No, I didn't. Q. You hadn't? Was anyone with you? A. No. Q. Do you remember what the weather was like? A. It was a fairly good day.

Q. Had you ever seen this automobile alongside of the bus as distinguished from the front of the bus? A. No, I just saw the car when it was going in to the Safeway. Q. It was going in to Safeway? A. Yes. Q. And you felt the brakes of the bus, did you? A. Yes. Q. Were you thrown around in your seat? .A. No, not very much. Q. Not very much? Did you see anyone other than Mr. Wilcoxen thrown? A. I saw him when he went down. Q. Anyone else? A. No. Q. Did you see any ladies thrown about? A. No, sir. Q. Now, from the moment of the application of the brakes until the bus came to a complete stop, can you give us any idea how far it traveled? A. A very short distance, I should say, about five feet."

On cross-examination by the Leavitts' attorney, Mrs. Rhyne testified, in part, as follows:

"Q. What first attracted your attention, when the gentleman fell? A. Yes. Q. That is what first attracted your attention? A. Yes. Q. And the bus lurched and he fell? A. Yes. Q. Were you sitting back of where Mr. Wilcoxen was standing? A. No, I was on the other side of the bus, on this side, second seat. Q. Where were you, ahead of him? A. No, I was — yes, I was ahead of him. Q. When he fell, did you see him fall in the aisle? A. Yes. Q. Fell beside your seat? A. Yes. Q. That attracted your attention somewhat? A. Yes. Q. I suppose you helped him there as well as you could? A. I didn't, because others there, so I didn't. Q. What first attracted your attention, the bus lurched and he fell in the aisle? A. Yes; first thing I seen the car going past the bus, when he gave the jerk and we all jerked in our seats. Q. You saw the car going into the parking lot? A. Yes. . . . Q. It was at right angles, traveling east at that time? A. Yes."

Mrs. Conner, called as a witness for the city, testified, in part, as follows:

"Q. Where were you seated on the bus? A. I was seated on the bus. Q. Where? A. You mean — Q. What seat, — center, front? A. It was about four or five seats back and on the east side going north. Q. Next to the window? A. Next to the window. I was alone in the seat. Q. Alone in the seat? A. Yes. Q. Next to the window? A. Next to the window. Q. Do you remember what kind of a day it was? A. Beautiful; regular Seattle sunshine.

"Q. Mrs. Conner, do you remember the bus stopping there and the gentleman falling? A. Yes. Q. Now, prior to that occasion, had you seen an automobile anywhere in the vicinity of the bus? A. The first time that I saw the automobile, it was just in front of the driver, going to get out of the way of the car, I imagine. Q. Well, you mustn't imagine anything. These fellows back here are going to object. Mrs. Conner, was it traveling in the same direction as the bus? A. Going east. Q. East, in front of the car? A. Uh-huh. Q. Close to it? A. I thought it was pretty close. Q. Give the jury any idea in distance and feet. A. I was afraid the bus was going to strike the automobile. Q. Have you any idea — we know you didn't measure it, nobody did, but can you, with reference to something in the room or, for example, was it as far away as I am from you or the length of the jury box? A. No, it wasn't that far away, no, probably as far as that perhaps. Q. You mean this item here? I see. A few feet. You hadn't seen it prior to the time? A. No. Q. Now, this — A. (Interposing) It was just in front of the bus, going east. Q. Can you tell the jury at that moment about how fast the bus was traveling? A. Well, it was going very slowly because we were just about in the bus zone. Q. Approaching the bus zone, you mean? A. Yes. Q. Do you remember the drive-in entrance to the Safeway? A. Yes, uh-huh. Q. Driveway? Can you tell the jury where it is? I mean, with relation to where it is, end of the block, center, or what? A. No, it is — I have driven there many times. It is on the south side of the Safeway, and the driveway is in, and there is a parking lot there, — Q. That is not — A. (continuing) — right on the corner. Q. At the street intersection or near the center of the block? A. Yes, it is near the street intersection, the south part of it. Q. Is the entrance to it in the center of the block or the end of the block? A. No, it just this side of Safeway. Q. Safeway Store, on the corner of a street? A. Yes, then the drive-in, you drive in on the south side of Safeway. Q. Turn into that driveway? A. Uh-huh. Q. Off of Greenwood? A. Yes, off of Greenwood. Q. Were you thrown about in your seat any? A. Oh, a little jar. Q. Just a little jar, and do you know where this gentleman that fell, whether he was seated, back of you, or, in front of you? A. He was in back of me, but all I could see, he was sliding along on the floor. Q. He fell and slid along the floor? A. I didn't see him fall, but when he passed my seat I saw him rolling along up to the front. I don't know whether he was on his back."

On cross-examination by the attorney for the Leavitts, Mrs. Conner further testified:

"Q. Mrs. Conner, I suppose when Mr. Wilcoxen fell on the aisle, that is probably what first attracted your attention? A. No, no, I noticed the car, the automobile as it was going through. I was sitting there. I noticed that car. Q. By the way — go ahead, I interrupted you. A. That is all right. Q. Is the parking zone for the bus, north of the drive-in to the Safeway Store? A. North? Q. North of the drive? A. No, it is south. Q. South of the driveway? A. South of the Safeway. The drive-in is south of the Safeway. There is a parking lot in there. You can drive in that driveway and go through to the other, to the street you see. Q. I don't think I made myself clear though. Is the bus zone north of this drive into the store, before you get to the bus stop, where the bus stops? A. Yes. Q. That is fine. Thank you. At the time that you noticed these things happening, the bus was pulling into the bus zone, was it? A. Yes. Q. Passed by the driver into the store? A. I couldn't say that. I know he was slowed down. I know that we hadn't got to the bus zone yet. Q. You saw this car entering into the parking lot? A. Yes, right straight across. Q. That is when you first noticed it? A. All at once it was — conductor's, — that is when the motorman's presence of mind, he jammed on the brakes. That is my opinion. I am telling you. Q. You were sitting on the east side? A. Yes. Q. You would have a view of the parking lot. A. I would have a view. I didn't look at the parking lot. I was watching that car, because I thought we were going to hit him. Q. When you saw the car it was entering the parking lot? A. Well, I imagine, yes."

By stipulation of the attorneys for all parties, a written statement made by a civil engineer who was a passenger on the bus, and who could not be present at the trial, was read to the jury. A portion of this statement read as follows:

"Tell in your own way how the accident happened? I was sitting in the second cross seat left side of coach. The bus stopped quickly to avoid hitting a car which made a left turn in front of the bus. (Bus was north bound) As the bus stopped an elderly man staggered forward past me turning as he went, and fell down on his back bumping his head rather heavily on the bus floor. A package, which he was

carrying, and his glasses which flew off, slid forward on the floor. Another passenger and I raised him to a sitting position and after a short rest assisted him to a seat and restored his packages and glasses. After the driver had gathered his information, the other passenger assisted the man home. He received a hard bump on the back of his head, but I do not know how seriously he was hurt. I thought, at the time he should have been examined by a doctor."

On cross-examination, the bus driver testified, in part, as follows:

"Q. And you first saw a car, you say, when you were passing him, moving into the bus zone? A. After I had passed 72nd. Q. You were moving into the bus zone? A. Slowing down, and he came up, on the left-hand side. Q. First saw this car when you were moving — do I speak loud enough? A. Yes. Q. First saw this car when you were moving in the bus zone, is that correct? A. Yes. Q. And the bus zone is north of the entrance to the Safeway Store, is it? A. Yes, north of that. Q. And you saw this car? Did it make a left turn in front of you? A. Made a left turn in front of me as I was going down. Q. Made a left turn in front of you, went to the parking lot, Safeway Store? A. Yes, as I was going down to go into the bus zone. Q. Were you busy about your work there? What other duties did you have? A. I was operating the coach, was looking right ahead, you know, get my markings, you know, and when this driver came right along in front of me — Q. Now, as you say, this happened a year and a half ago. It is hard to remember all these details. Can you be perfectly certain just from what direction or where this car came from? A. He came, going northbound, same direction I was, right down the side of the left-hand side of the coach. Q. I thought you told me he made a left turn? A. He came down and made a right turn. Q. Do you remember when I asked you some questions about this in Mr. McCullough's office the other evening, one of the depositions; remember, you were there? You remember the other evening? A. Yes. Q. Page 4, — I was asking you about this one myself. I asked you this question: 'Question: Did he come in from a side street or was he passing you?' and did you make this answer: 'Answer: I didn't notice which way he was coming from or whether he came in from a side street, or whether he was coming a southbound direction on Greenwood Avenue.' Q. (By Mr. DuPuis) Do you remember making that answer? A. I

was coming from the southbound,—yes. Q. Do you remember making that answer, 'you didn't notice'? A. Perhaps I did. I don't know. I said something there. Q. You are no more certain of it now than you were then? A. I am telling you he was going northbound the same direction I was, right up close to the side of the coach. Q. Let's follow that through a little bit. You say this car traveled northbound right along beside the coach? A. Right beside the coach. Q. This would be the car, this would be the coach, both are traveling northbound? A. That is right. Q. You are about opposite one another? A. He overtook me. He was, came right up, went ahead of me and made a turn. I was slowing down when he rode right ahead of me. Q. Let's go a little slower. Now, when you first saw him you were entering the bus zone? A. Way back at what I call would be back past 71st or just about there. Q. Let's get definite about it. Were you entering the bus zone or weren't you entering the bus zone? A. I was way back of the bus zone. I was swinging about a — Q. (Interposing) How far back? A. Getting ready to — getting ready to go into the bus zone. Q. When you first saw the car you say he was opposite where you sit in the bus? A. It was back, 72nd. Q. Can you remember, when you first saw him, he was opposite where you were sitting in the bus, is that correct? Is that what you told me? A. Yes, just about when he came right up and whipped in right in front of me. Q. How fast were you traveling at the time you first saw him, right opposite your seat? A. I don't know exactly now, probably ten or fifteen miles an hour. I know I was — I had my coach under control. Q. Neither car was going fast? A. He was a little faster than I, because he got ahead of me and turned in. Q. Two cars were moving beside one another, you say this car was able to make a turn, jack knife in front of you to go into that parking lot? A. That is what he did. He could easily do it, too. He didn't give a signal or warning that he was going to do it."

As hereinabove stated, it is amply established that a car cut in in front of the bus as it was about to draw up into the bus zone; but it is not at all clear whether the car came north on Greenwood avenue and made a right turn in front of the bus or whether it came south on that street and made a left turn in front of the bus. This was an important matter, for the jury was instructed:

"No. 15. If you find from a fair preponderance of the evidence that the operator of defendant's bus, through no negligence on his part, was compelled to stop or slow down said bus suddenly to avoid collision with another vehicle, then you are instructed that the defendant's operator was not guilty of negligence and plaintiffs cannot recover in this action against the defendant City of Seattle."

■ However, it was further instructed:

"No. 11. If you find, under the evidence, that the defendant bus driver was placed in a position of sudden peril due to his own negligence and lack of vigilance and care, if any, causing him, if you so find, to suddenly apply the brakes with undue force and suddenness, causing the injuries, if any, to this plaintiff, then I instruct you that the bus driver was guilty of negligence, and if you find such negligence was the proximate cause of the accident, your verdict will be against the City of Seattle only and you will allow no damages against the defendants Hiram Leavitt and wife."

The city excepted to instruction No. 11, but no error is assigned with respect to it. We think it correctly states the law; *Prior v. Safeway Stores*, 196 Wash. 382, 387, 388, 83 P. (2d) 241, 85 P. (2d) 1045; and, in view of the state of the evidence in this case, we think that it was appropriate and properly given.

The city, in stating, at the beginning of its brief, the questions involved in the appeal and cross-appeal, states the first question involved, as follows:

"Is it a case for the jury where the undisputed evidence in a 'jerk' case shows that the city bus driver came to a sudden stop solely to avoid collision with an automobile crossing his path ahead, causing injury to plaintiff, a passenger in the bus; or does it become such because the evidence is in dispute as to the identity of such automobile?"

The cross-appellants, in their restatement of the questions involved, restate the question stated in appellant's brief, as follows:

"Is it a case for the jury where a city bus driver comes to an unusually violent stop to avoid colliding with an automobile crossing its path ahead, where the evidence is in dispute as to the driver's opportunity to foresee and avoid the necessity for such a stop?"

We think the cross-appellants' statement is the more accurate, for it recognizes the fact that the jury was confronted with the emergency question. The problems submitted to the jury were not to be solved merely by the fact that the city's servant made the quick stop in order to escape collision with another car. The question as to where that car came from and when, had to be dealt with. No categorical answer can be given to this question. The driver testified, at some length, that it came up from behind him, ran alongside him for a time, and then cut right around to the right in front of him. But he also testified, at one point, that the car made a left turn to go into the parking lot, which placed it squarely in front of him as he was proceeding towards the bus stop. Jacobsen, whose statement was read, by stipulation of the parties, squarely stated that the automobile made a left turn in front of the bus. Greenwood avenue is a broad street. A driver coming south on it would be on the west side, and, to get into the parking lot, would have to completely cross the street, probably by swinging in a long curve to his left. The jury would have the right to infer that that occurred, and if the driver of the bus was on the lookout, he should have seen it, and could perhaps have changed his course and avoided the necessity of making what he called "a rough stop."

The appellant city first contends that the trial court committed error in refusing to grant a new trial on the ground that the verdict was so excessive that it must have been given under the influence of passion or prejudice.

Mr. Wilcoxen was advanced in years when the accident occurred. His exact age does not appear in the record, but it does appear that he came to Seattle in 1889, that he is more than seventy years of age, and that he and his wife have been married for fifty-three years. It is significant also that the bus driver and all of the passengers who testified at the trial uniformly referred to him as "the old gentleman." No bones were broken in the accident, but he received a severe bump on the back of his head which has resulted in persistent headaches, and his neck and back

muscles were very severely strained and continued to be painful for many months. During the month preceding the accident, he had had operations for varicose veins on both legs, and the accident delayed their healing. He was able, with the assistance of a passenger, to walk home from the scene of the accident, and, at the time of the trial, was able to take daily walks and attend to small matters about his house and grounds, but was unfitted for any manual work. He prayed for damages in the sum of $1,275.

On the part of Mrs. Wilcoxen, it was alleged that she had been deprived of the consortium and services of her husband, and suffered damages by reason thereof in the sum of $975. However, the proof as to this amount was wholly indefinite.

Plaintiffs further sought recovery for an additional sum of $175, alleged to have been expended or incurred for medical services. However, in this respect the amount proved was but $58.50.

In ruling upon the appellant city's alternative motion for a new trial, the trial court adjudged and decreed that the motion would be granted in the event, but only in the event, that plaintiffs should refuse to accept a reduced verdict in the sum of two thousand dollars. The plaintiffs agreed to accept the reduction.

Neither party was, or is, satisfied with that disposition of the matter. The appellant city urges us to hold that the trial judge erred in not granting a new trial, and that we should order the judgment for two thousand dollars, subsequently entered, be set aside and a new trial granted.

We find nothing in the record that induces us to think that the jury verdict was in any respect the result of passion or prejudice. At all events, the trial judge was in a much better position to rule on appellant's motion for a new trial than we could possibly be, and we are not of the view that any abuse of discretion is manifest in his refusal to grant the city a new trial.

In *Dyal v. Fire Companies Adjustment Bureau*, 23 Wn. (2d) 515, 522, 161 P. (2d) 321, we held, following previous

decisions, that, where the evidence is conflicting, it is wholly within the discretion of the trial court to grant or deny a motion for new trial, on the ground that the evidence is insufficient to justify the verdict, or that the verdict is against the weight of the evidence, in the absence of a manifest abuse of discretion.

Finding no abuse of discretion, we therefore hold that the trial court did not err in refusing to grant the city's motion for a new trial.

By their cross-appeal, the Wilcoxens seek to have the two-thousand-dollar judgment set aside and a judgment entered in their behalf in the amount of the jury verdict, that is, for $2,425, the amount prayed for in the complaint. Of this amount, $1,275 was asked for Mr. Wilcoxen's pain and suffering. Mrs. Wilcoxen sought $975 in damages for the loss of her husband's consortium. They asked for $175 with respect to sums expended or incurred for medical treatment. The jury gave them a verdict for the total of these sums, that is, for $2,425.

The trial judge ruled that he would grant the city's motion for a new trial unless the plaintiffs would consent to a judgment in their favor for two thousand dollars. They assign this as error. The judge appears to have made this ruling for two reasons: (1) because the evidence as to medical services showed an expenditure of but $58.50, while the jury evidently allowed the full $175 prayed for in the complaint; and (2) because the evidence in support of the claim of $975 as special damages for loss of consortium was very indefinite and uncertain. The cross-appellants grant the soundness of the first of these reasons, and concede that the verdict should not have exceeded $2,308.50.

Considerable evidence was offered by the plaintiffs in an attempt to prove the damages for loss of consortium, which was, on objection of defendants, not received; but no error has been assigned as to these rulings.

We are of the opinion that the ruling of the trial judge, that he would grant the city a new trial unless the plaintiffs would accept a judgment of two thousand dollars, was not erroneous. We are further of the opinion that the

plaintiffs wisely exercised the option thus afforded them by accepting the two-thousand-dollar judgment, because their case has great elements of weakness, and had they elected a new trial, there is no surety that they would have received that amount, or any amount at all. We leave the matter as it was determined in the trial court.

The judgment appealed from, and cross-appealed from, will stand affirmed.

JEFFERS, C. J., BEALS, STEINERT, and MALLERY, JJ., concur.

April 18, 1949. Petition for rehearing denied.