[No. 30690.   *En Banc.*   June 16, 1949.]

BERGIT NOPSON, *Appellant,* v. THE CITY OF SEATTLE, *Respondent.*[1]

[1]Reported in 207 P. (2d) 674.

*Erle W. Horswill,* for appellant.

*A. C. Van Soelen* and *Arthur Schramm,* for respondent.

JEFFERS, C. J.—This is an action for personal injuries instituted by Bergit Nopson against the city of Seattle. It is alleged in paragraph No. 3 of the complaint:

"That on or about the 7th day of November, 1946, plaintiff was riding as a passenger on a bus operated by said defendant and driven by one of its employees. That near the intersection of 3rd avenue and Pine street said bus came to a sudden and violent stop and without warning throwing the plaintiff, all this being through the negligence of the defendant, its agents, and employees."

The acts of negligence with which defendant is charged, as set out in paragraph No. 4, are as follows:

"1. In traveling at an excessive rate of speed to wit: in excess of 25 miles per hour.

"2. In failing to keep said bus under control.

"3. In failing to keep a lookout for other vehicles using street.

"4. Making an abrupt violent stop when he knew or should have known that the plaintiff and other passengers were standing in the aisle."

Defendant answered the complaint, admitting that at the time and place referred to in the complaint plaintiff was riding as a passenger on a bus operated by the defendant. The answer further admitted that near the intersection of Third

avenue and Pine street the bus came to a sudden stop, but denied that such stop occurred through the negligence of defendant or its agent, and alleged that the stop was made to avoid collision with an automobile which swerved from the adjacent traffic lane immediately into the path of defendant's bus, and that the sudden stop was necessary to avoid collision with the automobile and to avoid damage to all of the passengers in the bus. The answer denied all allegations of negligence contained in paragraph No. 4 of the complaint.

The cause came on for trial on January 14, 1948, before the court and jury on the pleadings above referred to, and thereafter, on January 15th, the jury returned a verdict in favor of plaintiff in the sum of two thousand seven hundred fifty dollars. Defendant timely filed a motion for judgment notwithstanding the verdict and an alternative motion for new trial. On April 7, 1948, the court entered an order denying defendant's motion for judgment notwithstanding the verdict, and granting the motion for new trial upon the following specific ground:

"That an error was committed by the court in submitting instruction No. 8 to the jury, being an instruction on *res ipsa loquitur.*"

Plaintiff has appealed from the order granting defendant's motion for a new trial.

The assignments of error are (1) in granting respondent's motion for new trial, and (2) in failing to enter judgment for appellant on the verdict.

Appellant's contention is that her evidence was sufficient to raise the *res ipsa loquitur* doctrine, and therefore the court properly gave instruction No. 8; that the court erred in granting a new trial because of the submission to the jury of the instruction on *res ipsa loquitur.*

The following is the relevant testimony introduced by appellant (plaintiff below) in her case in chief. At the time of this accident, Mrs. Nopson was eighty-four years of age. On the day of the accident, appellant and her daughter, Mrs. Floyd Miller, had boarded a city bus at Sixty-second and

Meridian. They were going down town to meet two other daughters of appellant at the corner of Third avenue and Pine street. As the bus turned from Stewart street south on Third avenue, the trolley became disconnected and the bus stopped. At this time appellant and her daughter were seated, and they did not get up until after the bus had started. Mrs. Miller had given the signal indicating that she desired to leave the bus at Third avenue and Pine street, and after the trolley had been adjusted and the bus started, Mrs. Miller and appellant both left their seats and approached the back door of the bus for the purpose of alighting at Third and Pine.

It is not too clear at just what point the bus came to a sudden stop, but apparently it was just a short distance before it reached the intersection of Third and Pine. At this time Mrs. Miller was standing on the top step, and appellant was standing in the aisle, holding on to the hand rail on the top of the seats on either side of the aisle. We quote from appellant's testimony relative to this stop:

"Q. I say, what kind of a stop was this that the bus made when it got down— A. Oh, it stopped just terribly fast, just like a shot. Q. What happened to you? A. I fell backwards in the aisle. I didn't know. Somebody came and picked me up. . . . Q. What happened then, Mrs. Nopson, after that? After you were down on the floor what was done? A. Somebody come and picked me up. I tried to get up, but I couldn't. Somebody came and picked me up and helped me up there."

Mrs. Nopson was subsequently taken off the bus and taken to the Seattle General hospital.

We quote from Mrs. Miller's testimony relative to this stop:

"Q. After he got the trolley poles on, what did the bus driver do? A. Well, jumped on the bus and started up at such a great speed and continued that way until he got nearly to Third and Pine where all of a sudden he stopped with the most terrible jolt I have ever experienced in my life, and I looked up and I didn't see anything in front of the bus at all. Q. Let me stop you there. When you felt this jolt, did you look toward the front of the bus? A. Well, I looked

to see why he had stopped at such a jolt. Q. Did you look toward the front of the bus? A. Yes. Q. Was there anything when you looked there in the way of the bus or between the bus and the corner? A. I didn't see anything. Q. In the lane of traffic it was traveling in? A. I didn't see anything."

Mrs. Miller testified further that the only thing which prevented her from falling was that she was standing on the first step and holding with both hands to the railing which extended across the seat.

Josephine Reece was called as a witness for appellant, and testified that she was on the bus involved in this action on November 7, 1946; that she and a friend, Mrs. Bulman, were going to get off the bus at Third and Pine; that she had never seen Mrs. Nopson prior to the accident here involved; that she had not paid much attention to the way the bus was being driven until after it turned south on Third avenue; that just before the bus reached the intersection of Pine street, it made a very sudden stop; that prior to this stop it had been going pretty fast down Third avenue; that just prior to the sudden stop to which the witness referred, she was gripping the seat in front of her.

"Q. What happened very shortly after that? A. Well, this sudden stop of the bus. Q. I see. And what happened to you when the bus made that sudden stop? A. It threw me forward onto my—I was holding the front of the seat, and it threw my body, the weight of my body onto my wrist and sprained that wrist; that is, it felt like it was sprained. It was very very painful."

This witness further testified that she saw Mrs. Nopson fall; that after the fall she was lying on the floor, and several people helped her to her feet and put her in her seat.

Mrs. Arthur Bulman, referred to in Mrs. Reece's testimony, was also called as a witness by appellant, and testified that she was on the bus the day of the accident. She stated that it was a very rainy day; that it was raining when they got on the bus, and was raining at the time it stopped.

"Q. All right. Now, do you recall rounding the turn at Third and Stewart on that day? A. Yes, I do. Q. Do you remember anything unusual that happened on that day as

you were rounding the turn? A. Yes, I do. The trolley came off. Q. Did the bus stop as soon as the trolley came off or not? A. No. I think we coasted, just cleared the corner. . . . Q. What happened then, Mrs. Bulman? Did the trolleyman get out and put the trolley back on? A. Yes, and then got back on the bus. Q. Let me interrupt you for a minute. Were you and Mrs. Reece sitting together? A. We were sitting together. Q. In what seat on the bus were you sitting, approximately? A. I think it was the second from the last, next to—not the one nearest the rear door, but the one ahead of that. Q. I see. You mean the second one in front, to the front from the rear door? A. On the right, yes. Q. Now, did you notice anything about the bus starting up on that occasion? A. Well, it started up real fast . . . Q. What was the nature of the stop that occurred? A. It was very sudden. Q. Did it have any effect on you as you were sitting in the bus? A. Yes. I was thrown forward in the seat. Q. Do you know what effect, if any, it had on Mrs. Reece's body? A. Yes. She had her hand up to protect herself and she hurt her wrist. Q. What did you do immediately after you felt these brakes being applied? A. I think I glanced up out of the window, front window. Q. The which window? A. The front window. Q. I see, and as you glanced out of the front window, did you see anything in front of the bus? A. No, sir. Q. Did you have —from the sitting position there as you were, can you see out of that front window? A. Fairly well, I think. Q. Was there anything at all in the bus's line of travel between the bus and the corner at that time? A. Not to my knowledge."

This witness thought the front end of the bus was about forty feet from the Pine street intersection when it started to stop, and she was of the opinion that, as stated by her, "it stopped right there."

The testimony of Dr. McLemore is to the effect that when he examined Mrs. Nopson at the hospital after the accident, he found that she had what he described as "the intercapsulary fracture of the head of the femur."

The above-quoted testimony is a fair summary of all the testimony introduced by appellant as to the nature of the stop with which we are here concerned, prior to the time appellant rested.

Robert C. Hill was the first witness called by respondent. This witness stated that he was not and never had been employed by the city of Seattle; that on the date of the accident he was on the bus hereinbefore mentioned.

"Q. Mr. Hill, please, in your own language, in your own words, tell us what happened starting at the turn up there at Stewart street and third. Tell us what happened. A. Well, as I recall, it was a very wet morning. It was about 11:10. As the bus turned from Stewart into Third street, the trolley came off. The operator got out. He opened the doors, as usual and went to replace the trolley. Just prior to this occurrence the two ladies, Mrs. Nopson and the other lady arose and went to the rear door apparently to— Q. Pardon me for the interruption. Prior to making the turn from Stewart to Third? A. That is my recollection. It may have been just about that time. Q. All right sir. Go ahead. A. The door was open and the operator replaced the trolleys, and my recollection is he had a little trouble. It took longer than usual, and while this was going on these two ladies were still standing at the rear door apparently intending to leave at the next stop. They continued to stand at the door and the bus resumed its course down Third avenue. Q. All right, now, then, what did the bus do after that, if anything, or what happened? A. The bus proceeded to about, I would say about seventy-five feet north of Pine street. Q. To within a point of seventy-five feet north, you mean? A. Approximately, I would say. Seventy-five feet. Q. Go ahead. A. There was a very sudden jerk and I arose to see what was the trouble and I just saw the rear end of— I don't know whether it was an automobile or a truck, but automotive equipment that had crossed diagonally in front. . . . Was this automotive equipment traveling in the same direction as the bus? A. Yes. Q. Originally? A. Crossed over in front of the bus. Q. About that moment how fast was this trolley bus traveling in miles per hour, would you estimate? A. It was traveling very slowly. I'd say, in my opinion, not more than fifteen miles per hour. There was considerable traffic ahead of them."

This witness further testified that it was almost an immediate stop.

"Q. Did this automobile stop or continue on? A. Continued on. Q. Continued on. Were you thrown about in your seat any? A. No. I was sitting when the stop came.

Q. Were you thrown forward, your chest against the seat in front of you? A. No. Q. You weren't anticipating this thing to happen? A. No."

Mrs. George McCallister was also called as a witness for the city, and testified that she was on the bus on the day in question, and was seated directly behind the driver. She was asked to describe what happened after the bus turned onto Third avenue from Stewart street.

"A. Yes. He lost his trolleys. Q. He lost his trolleys. I see. Then did he put them on? A. Yes, sir. Q. Could you give us any idea how long it took him to do that? A. A couple of minutes. Q. You think a couple of minutes? You weren't paying much attention to that? A. No. Q. After he put them on he started up again, did he? A. Yes, sir. Q. How fast did he proceed down Third avenue between that point and the point where he stopped suddenly? A. It was very slow, practically creeping. Q. Did you see any vehicle drive up alongside of the bus at any time? A. Yes. There was a car. It was driving alongside quite close. Q. You turn to the jury and tell in your own words and tell what you saw and what this motor vehicle did. A. This car was close all the way down the street, and just, oh, about ten feet before we got to the intersection, it cut directly in front of us. The driver had to slam on the brake, the emergency brake, both at the same time. He stopped suddenly. Q. Did you see any passengers standing on their feet just prior to this stopping? A. No, I didn't, because I was watching this car alongside of us. I was up in front and couldn't see. Q. You were on the left hand side just behind the driver on this bus and seated next to the left hand window? A. I was kind of looking out of this window on the side there. Q. You saw this automobile come in? A. That is right. . . . Q. Now, were you disturbed on your seat? A. No, I wasn't. Q. Did you see Mrs. Nopson, see her when she was thrown down? A. No, I didn't. Q. Do you remember the make of this car, Mrs. McCallister? A. All I can remember is it was just a gray car. Q. You remember it was a gray car? Was it a truck or passenger car? A. Passenger car."

This witness further testified on cross-examination that the car suddenly swung in front of the bus, and that as it did so the bus driver immediately applied his brakes; that it

seemed to her there were just inches separating the bus and the car.

Mrs. Luella M. Bishop was also called as a witness by the city, and testified that she was on the bus the day of the accident; that there was just one seat between her and the driver. The witness was asked what transpired after the trolley was replaced, and she answered:

"A. We proceeded normally on down the street, and just as we got on, past the middle of the block, a car came from the left hand side of the bus, and before it even got past the bus, probably about halfway, the car was about halfway past the bus and he cut shortly—sharply in in front of the bus. In fact, I held my breath. I didn't see how in the world the driver could avoid crashing broadside in the side of the car, but he didn't. He slammed on the brakes and stopped the bus in time to avoid hitting the car which didn't seem possible, but he did it. And just as—at the time that—or just after—I don't know—just when it was I don't know, but it seemed simultaneously, a woman cried out, and of course, I didn't look at the car any more. I turned around to see what had happened and saw the lady—well, two ladies were standing in the aisle, and the driver immediately stopped the bus. I believe he pulled up to the curb a little bit, but he stopped the bus as soon as he could and went back to see what was wrong, and he asked the lady if she was hurt, and she didn't seem to think she was, too badly hurt, and he said, 'You'd better go to the hospital and get checked up.' Well, she didn't seem to think so—too well of that idea, but between the bus driver and I think it was the lady's daughter, they persuaded her to go and get examined, and I think it was the bus stop that he stopped at, and he called the dispatcher and had them send an ambulance or car or whatever it was to take her to the hospital for examination."

Robert L. Stablein, who was in charge of the bus on the day of the accident, was called by the city, and testified that the accident happened about eleven-fifteen in the morning. Mr. Stablein had been operating busses for the city since June, 1939. He also testified as to trouble with the trolley as he turned south on Third avenue from Stewart street. He stated that after he had cleared the corner he stopped the bus and opened the front and rear doors. He further testi-

fied that when the rear door is opened it automatically puts the air pressure upon the brakes, and the bus cannot move until the door is closed.

His testimony relative to the stop which it is contended caused appellant's injury, was in substance as follows: After he had put the trolley back on, he proceeded down Third avenue, reaching a top speed of about twelve to fifteen miles an hour. He first noticed there were cars back of him, and then he noticed a dark gray car come alongside the bus. All of a sudden this automobile accelerated its speed and swung directly to the right in front of him. He immediately put on his foot brake and pulled on the emergency brake, and the bus came to a stop within approximately four and one-half or five feet. Mr. Stablein stated that there was no doubt there was a decided jump of the bus when it came to a stop; that he heard a woman scream and immediately got out of his seat.

"A. There was this Mrs. Nopson hanging onto one railing, and another woman whom I found to be her daughter, standing there, and she was hanging onto this seat, the bar that runs over the top of this seat, and she had hold of this. Q. What did you do then with respect to this situation? A. I asked the woman—I said, 'Are you hurt?' And she said, 'Oh, I don't think I am hurt very badly.' I said, 'Can you stand on that leg?' She must have been standing on the leg that wasn't hurt. She tried to put weight on it and she winced. I said, 'Listen, madam, you better sit down in this seat, and we'll see what is the trouble.' We got her in the seat, and I asked where—'Where does it hurt?' and she said, 'Well, my hip hurts.' "

After the accident, Mr. Stablein pulled on down the street to the loading zone south of Pine street, and thereafter went on down to Pike street where there is a dispatcher's phone, and reported what had happened. Mrs. Nopson was then removed from the bus and taken to a hospital.

This witness further testified that on these busses it is impossible to start as rapidly as a car may be started; that no matter how far the pedal is pressed down it takes some time for the bus to gain momentum, as it is all done automatically, and it is impossible to start with a jerk.

Instruction No. 8 reads as follows:

"If you find from the evidence that the fact that the manner of the stopping of the bus was of such a nature as would not, in the ordinary course of events, happen if those who had the control, supervision and operation thereof had used proper and reasonable care, then I instruct you that you may infer from the fact that such a stop was made was due to the negligence of the defendant, and a *prima facie* case is thereby established in favor of the plaintiff.

"The burden then devolves upon the defendant to furnish an explanation or rebuttal of such *prima facie* case by producing evidence of due care and precaution under the circumstances and conditions necessarily within defendant's exclusive control. If, then, after considering such explanations of the whole case, and of all the issues as to negligence, injury and damages, the evidence still preponderates in favor of the plaintiff, then plaintiff is entitled to recover; otherwise not."

■ It may be stated as a general rule that a carrier is not liable for injuries sustained by passengers as the result of ordinary jolts, jerks, or stops which are among the usual incidents of travel. *Wade v. North Coast Transp. Co.,* 165 Wash. 418, 5 P. (2d) 985; *Wiggins v. North Coast Transp. Co.,* 2 Wn. (2d) 446, 98 P. (2d) 675. In the last cited case, we stated:

"In order to establish liability of a carrier, it is not enough that plaintiff show that the stage was 'going quite fast,' or that it gave a 'sudden lurch or jerk,' as in the case of *Wade v. North Coast Transportation Co.,* 165 Wash. 418, 5 P. (2d) 985, cited by appellant, or that there was a sudden stop, but there must be evidence of what appeared to take place, as physical facts from which it can be inferred that the operator of the vehicle was negligent, or evidence capable of conveying to the ordinary mind a definite conception of some conduct on the part of those in charge of the vehicle, outside of that of ordinary experience, on which a finding of negligence could rest."

We shall not attempt to cite and discuss the many cases decided by this court relative to the doctrine of *res ipsa loquitur* and its application. The trial court in its memorandum decision cited and quoted from *Keller v. Seattle,* 200 Wash. 573, 94 P. (2d) 184. This case involved an action for

damages brought by Mrs. Keller against the city of Seattle. Mrs. Keller claimed to have been injured by a sudden jerk of a street car, which threw her with great force against the seat. The occurrence happened between intersections. The cited case refers to and quotes from *Firebaugh v. Seattle Electric Co.,* 40 Wash. 658, 661, 82 Pac. 995, 111 Am. St. 990, 2 L. R. A. (N. S.) 836. In the latter case, we stated:

"It is insisted by the appellant that it is manifest that this court has not intended to announce the rule that there is a presumption of negligence *unless it is apparent that the accident could not have happened without negligence on the part of the carrier.* This is no doubt true, for the rule of *res ipsa loquitur* is based upon the apparent fact that the accident *could not have happened* without negligence on the part of the carrier; or, upon the literal meaning of the expression, that the thing itself speaks, and shows *prima facie* that the carrier was negligent." (Italics ours.)

We are of the opinion that what we believe is the basic rule announced by Judge Dunbar, the writer of the opinion, in the *Firebaugh* case, *supra,* namely, that the doctrine of *res ipsa loquitur* is based on the apparent fact that the accident could not have happened without negligence on the part of the carrier, has never been receded from by the court. While different language may have been used in some of the decisions, it is our opinion the rule as above announced is still the rule in this state.

We think the following language used in the *Keller* case, *supra,* could be applied with greater force to the operator of a bus on a city street than it could to the motorman in the *Keller* case:

"It is a matter of common knowledge that a motorman, while operating his car between stops, is often confronted with dangers which require the sudden setting of brakes, such as a jaywalking pedestrian, a child running into the street after a ball, an automobile or truck going in the same direction suddenly pulling over into the middle of the street or suddenly veering so close to the track as to make a collision probable."

In the instant case, as in the *Keller* case, there is no question but what the action was based upon the theory that

appellant was injured by the careless manner in which the bus was operated. In other words, the theory of appellant is that the driver of the bus was negligent in bringing the bus to such a sudden and violent stop.

In the case of *Anderson v. Harrison,* 4 Wn. (2d) 265, 272-3, 103 P. (2d) 320, we again affirmed in substance the statement hereinbefore quoted from the *Firebaugh* case, using the following language:

"The rationale of that doctrine [*res ipsa loquitur*], as interpreted by our decisions, is that, when an accident occurs, or an injury is inflicted, under circumstances which are of such an unusual character as, in the light of ordinary experience, are inexplicable except as the result of negligence of the carrier, negligence will be presumed, and the burden is then cast upon the carrier to show that its negligence did not cause the injury. [Citing cases.]"

We also stated in the *Anderson* case:

"The presumption of negligence 'arises not from the naked fact that an injury has been inflicted, but from the cause of the injury, or from other circumstances attending it.' [Citing cases.] Nor is that principle affected by a variance in the degree of care required to be exercised by the party charged with negligence. Even though the highest degree of care be required in a given instance, the mere fact of injury alone, apart from the causative factors, does not of itself raise a presumption of negligence."

In two very recent cases, namely, *Morner v. Union Pac. R. Co.,* 31 Wn. (2d) 282, 196 P. (2d) 744, and *Carbery v. Fidelity Sav. & Loan Ass'n,* 32 Wn. (2d) 391, 201 P. (2d) 726, we considered the doctrine of *res ipsa loquitur* and its application. In the *Morner* case, many of our decisions are collected, and certain principles based upon these decisions are announced. We stated therein:

"The doctrine of *res ipsa loquitur,* an expression which literally translated means 'the thing speaks for itself,' as applied in this state and most jurisdictions is as follows: When the agency or instrumentality which caused the injury complained of is shown to have been under the exclusive control and management of the defendant or his servants, and the accident, or injurious occurrence, is such as in the ordinary course of events does not happen if those

who have the control and management of the agency or instrumentality use proper care, the injurious occurrence of itself, in the absence of explanation by the defendant, affords reasonable evidence, or a permissible inference, that such occurrence arose from or was caused by the defendant's want of care. [Citing cases. In addition to our own decisions, we cited, in support of the above statement, 38 Am. Jur. 989, Negligence, § 295; 45 C. J. 1193, Negligence, § 768; 9 Wigmore, Evidence (3d ed.), § 2509; 1 Shearman and Redfield, Negligence (Rev. ed.) 151, § 56; 13 Wash. L. Rev. 215.] . . .

"The doctrine of *res ipsa loquitur* is based in part upon the theory that the defendant, having the sole and exclusive charge of the agency or instrumentality which caused the injury, knows the cause of the accident, or injurious occurrence, or has the best opportunity of ascertaining it, and should, therefore, be required to produce the evidence in explanation thereof, while, on the other hand, the plaintiff has no such knowldge and is, therefore, compelled to allege negligence in general terms and to rely upon proof of the happening of such occurrence to establish negligence. . . .

"While the theory upon which the doctrine of *res ipsa loquitur* rests is well understood, there is no fixed, general rule determining its applicability in all cases, nor can any exact classification be made of the instances in which the maxim as a rule of evidence is to be applied. Whether or not the doctrine is applicable in a specific instance depends upon the peculiar facts and circumstances of the individual case. *McClellan v. Schwartz,* 97 Wash. 417, 166 Pac. 783.

"With reference to the application of the doctrine, this court, in common with many others, has held that while the maxim, when properly applied, is of value in the administration of justice, its scope is nevertheless limited, and ordinarily it is to be sparingly applied, in peculiar and exceptional cases, and only *where the facts and the demands of justice make its application essential."* (Italics ours.)

As to the applicability of the doctrine of *res ipsa loquitur,* this court, in the course of the opinion in the *Morner* case, stated:

"A wealth of cases will be found in 45 C. J. 1214, Negligence, § 781, supporting the statement therein that:

" 'As a necessary basis for the application of the doctrine, it must appear, in conformity with the statements of the

rule, that the negligent cause or thing which produced the injury complained of was wholly and exclusively in the possession, and under the control or management, of defendant or his servants. Accordingly the doctrine cannot be invoked where there is a divided responsibility and the accident is due in part to the act of a third party over whom defendant has no control, or where the injuring agency is partly or entirely under the control or management of plaintiff.' "

We further stated in the cited case:

"Since, in our opinion, the evidence clearly demonstrates that the injurious occurrence here involved resulted or could have resulted from the operation of one or more agencies or instrumentalities, or from several independent agencies or instrumentalities operating concurrently, the doctrine of *res ipsa loquitur* was not applicable."

In the instant case, appellant pleaded specific acts of negligence. Respondent, to meet appellant's contention relative to the claimed unusual and violent stop, introduced the testimony of four witnesses, three of whom were entirely disinterested, to the effect that the stop was caused by a car cutting across directly in front of the bus, necessitating the immediate application of the brakes in order to avoid a collision. There is some negative testimony in behalf of appellant to the effect that two of her witnesses looked and did not see anything in front of the bus, but we are of the opinion that the evidence is almost conclusive that a car did cut in front of the bus, necessitating the application of the brakes and the abrupt stop which followed.

In the *Carbery* case, *supra,* the trial court gave an instruction on *res ipsa loquitur.* A verdict and judgment for the plaintiff followed. In reversing the case, we stated:

"By the instruction complained of, the court told the jury that, under the circumstances stated in the instruction, they might *infer negligence on the part of the elevator operator.*

"There was no evidence to the effect that the appliance used in opening and closing the door was defective in any way, or that it had broken or failed to function properly during the operation in question. Had there been such evidence, an instruction on the doctrine of *res ipsa loquitur* might have been appropriate; but, by the instruction com-

plained of, the court permitted the jury to go beyond the direct evidence and infer negligence on the part of the operator.

"Under the evidence before the jury, there was no proper basis for such an instruction, and the instruction was erroneous and prejudicial, as inviting speculation concerning unknown causes, not disclosed by the evidence, which resulted in the injuries suffered by respondent." (Italics ours.)

It is apparent that the mechanical appliances, namely the brakes, which were directly responsible for the stop in the instant case, were functioning properly, as, according to appellant's own testimony, this heavy bus came to an almost instant stop.

We are of the opinion that, in the instant case, the demands of justice do not require, nor do the circumstances surrounding this stop justify, an instruction on the doctrine of *res ipsa loquitur*. In other words, we are of the opinion that the evidence introduced by appellant does not show that the accident was of such a character that it *could not have happened without negligence on the part of the operator of the bus.*

We are of the opinion, however, that there was sufficient *evidence* introduced on the part of appellant to take the case to the jury on the theory that the operator of the bus was guilty of negligence in making this stop in the manner and place he did, there not appearing to have been any necessity for making an emergency stop. However, when the city introduced proof to the effect that it became necessary to make the sudden stop because of the fact that a car had cut across directly in front of the bus, the case should have been submitted to the jury on the issue raised by the *evidence* of appellant and that presented by respondent.

We are of the opinion that the court, by instructions Nos. 7 and 9, hereinafter quoted, and other instructions given, fully covered the issues presented in this case.

"No. 7. You are instructed that the law recognizes that to a certain extent jerking, jolting, lurching and swaying of trolley coaches is unavoidable in the practical operation

of such trolley coach, and is necessarily incident to their ordinary and careful operation. In order to recover in this cause the plaintiff must show by a fair preponderance of evidence that the jerking or jolting or lurching and swaying of the trolley coach upon which said plaintiff was a passenger, and as complained of, if such did occur, was unusual, extraordinary, unnecessary and the result of the careless and negligent operation of said trolley coach by the employee of the defendant, The City of Seattle, in charge thereof."

"No. 9. If you find from a fair preponderance of the evidence that the operator of defendant's bus through no negligence on his part was compelled to stop or slow down said bus suddenly to avoid collision with another vehicle, then you are instructed that the defendant's operator was not guilty of negligence and plaintiff cannot recover in this action."

■ We are further of the opinion that it was not only error to give instruction No. 8, but prejudicial error, justifying the trial court in granting respondent city's motion for a new trial.

■ Respondent also claims that the court erred in giving instructions Nos. 4 and 6, and in view of the fact that this case must be remanded for a new trial, we think reference should be made to this contention. There is no question but what, under the case of *Larson v. Seattle,* 25 Wn. (2d) 291, 171 P. (2d) 212, respondent on this appeal must raise the question of error on other instructions, or the instructions given would become the law of the case on a second trial.

■ We are thoroughly convinced that the court was in error in giving instruction No. 4, especially the first part of such instruction, which reads:

"The law requires that a trolley coach operator must drive at all times with a much greater care for his passengers' safety than must the driver of a private car."

The jury were instructed by instruction No. 5 that the operator of the bus was required to drive same with the highest degree of care for the safety of his passengers consistent with the practical operation of the bus. By instruction No. 11 the jury were told that respondent would be

liable for the slightest degree of negligence on the part of the operator of the bus if they found that such negligence was the proximate cause of the accident in question.

We are of the opinion that it not only was unnecessary to give instruction No. 4, but that it was error to attempt to compare the duty of a bus operator with that of the operator of a private car. In other words, that comparison is so indefinite as to give to the jury nothing upon which to base a conclusion, and we think it is misleading.

■ We are also of the opinion that instruction No. 6 as given by the court is not a proper statement of the law. Such instruction reads:

"You are instructed that a public trolley coach operator is bound to assume in driving his coach that he may at any time be confronted with the necessity of making an emergency stop in traffic; that he is bound at all times to drive his trolley coach with the highest degree of care for his passengers compatible with practical operation and at such speed and with such control that if confronted by an emergency, he can apply his brakes without unreasonable danger of injury to his passengers."

It is true that it is a matter of common knowledge that the driver of a bus is undoubtedly often confronted with dangers between stops which may require the sudden application of his brakes. However, there is no law of which we are aware which requires such operator to assume at all times that he is going to be confronted with an emergency stop, and to drive at such speed that, if confronted by an emergency, he can apply his brakes without unreasonable danger of injury to his passengers. It seems to us this instruction announces, in effect, a rule contrary to the one often announced by this and other courts, to the effect that a driver has the right to assume, until he knows or should know to the contrary, that the other users of the road will obey the rules of the road. We are of the opinion that the jury, by instruction No. 5 as given by the court, were properly instructed on the matter of speed and control of the bus referred to in instruction No. 6.

Instruction No. 5 refers to the statute relative to the necessity of operating a vehicle of any character in a careful and prudent manner and at a rate of speed no greater than is reasonable and proper under the conditions existing at the point of operation, taking into account the amount and character of traffic, etc. After such reference to the statute and the speeds permissible in the city, the instruction further states:

"You are instructed that if you find that defendant's driver drove at a speed in excess of 25 miles per hour; or did not drive at a reasonable minimum speed as defined by the statute quoted; or drove at a speed higher than that which would be proper, in light of the surrounding circumstances, traffic conditions, and place where he was driving due to his duty to use the highest degree of care for his passengers consistent with practical operation; then he would be negligent, and you must find for the plaintiff, if this negligence, if any, was a proximate cause of plaintiff's injuries."

For the reason specifically referred to in the court's order, and for the reason that, in our opinion, error was also committed in giving instructions Nos. 4 and 6, the judgment of the trial court granting a new trial must be, and it is, affirmed.

ROBINSON, STEINERT, and SIMPSON, JJ., concur.

SCHWELLENBACH, J. (concurring in the result)—I concur with the exception that I believe that the giving of instruction No. 6 was correct.

BEALS, J. (concurring)—Appellant, in her complaint, alleged that, while a passenger on a bus operated by the respondent, she was injured, as the result of a sudden and violent stop made by the bus. She alleged several specific acts of negligence on the part of the bus driver, mainly, traveling at an excessive speed, failing to keep the bus under control, failing to keep a lookout for other vehicles using the street, and making an abrupt and violent stop.

Answering the complaint, respondent admitted that, at a point near the intersection of Third avenue and Pine street, the "bus came to a sudden stop," but denied that

this occurred through the negligence of the operator of the bus, alleging that the stop was necessary in order to avoid a collision with an automobile, which swerved from an adjacent traffic lane into the path of the bus.

The issues presented by the pleadings were clearly stated. Respondent admitted that the bus made a sudden stop, but pleaded a necessity therefor. The evidence was directed to this issue. The driver of the bus testified that a car suddenly swerved in front of the bus, and that, to avoid colliding with the car, it was necessary to stop the bus as quickly as possible. His testimony was corroborated by some of the passengers. Witnesses called by appellant testified that they were riding on the bus and saw no car move to a position of danger in front of it. These issues were clearly presented to the jury by the court's instructions Nos. 7 and 9, quoted by the majority.

By instruction No. 8, also quoted in the majority opinion, to which respondent excepted, the trial court brought before the jury the doctrine of *res ipsa loquitur*, telling the jury that, if the "manner of the stopping of the bus was of such a nature as would not, in the ordinary course of events, happen," had the driver used proper and reasonable care, the jury might "infer from the fact that such a stop was made was due to the negligence of the defendant," and that a *prima facie* case was thereby established in favor of appellant. The court continued by instructing the jury that the burden then rested upon respondent to furnish an explanation of or rebuttal to the *prima facie* case by producing evidence of due care and precaution. Later, the trial court granted respondent city's motion for a new trial, upon the stated ground that the court had erred in giving to the jury instruction No. 8, referred to above.

It was admitted that the bus made a sudden stop, and that appellant was thrown to the floor of the bus and injured. Respondent took its position definitely upon one, and one only, excuse for the sudden stop and the resulting jolt of the car, namely, the unexpected appearance in front of the bus of an automobile, which had made a quick turn from an adjoining traffic lane.

By instruction No. 7, the trial court had instructed the jury that, in order to recover judgment against respondent, appellant was required to show, by a fair preponderance of the evidence, that the jolt of the car was unusual, extraordinary, and unnecessary, and that it was the result of careless and negligent operation of the bus by respondent's employee.

By instruction No. 9, the jury were told that, if the driver of the bus was compelled to stop or slow the bus suddenly in order to avoid a collision with another vehicle, the operator of the bus was not guilty of negligence, and that appellant could not recover.

By its instructions Nos. 7 and 9, and other instructions, the court properly and adequately placed before the jury the issues which they were required to determine.

Appellant, by the evidence which she introduced, clearly made a case for the jury, by showing that the bus stopped with a serious and unusual jolt, and that she was thrown to the floor and injured.

Respondent city met this challenge and introduced evidence showing a reasonable cause for the sudden stop. This evidence was controverted by evidence introduced by appellant. Respondent definitely took the position that the sudden stop was necessary to avoid a dangerous collision with an automobile. There was no evidence whatever tending to show that the bus or its equipment was defective in any way.

Under the evidence, there was no place for an instruction bringing before the jury the doctrine of *res ipsa loquitur*. The factual issues were clearly defined by the pleadings and the evidence. Either the sudden stop of the bus was justified, by the testimony of the driver, supported by other testimony, or, under all the evidence in the case, the stop was not justified.

Instruction No. 8 permitted the jury to go beyond the evidence and "infer" that the sudden stop made by the bus was the result of the operator's negligence, regardless of whether or not any evidence had been introduced from which the jury could properly find that the operator of the

bus had been guilty of any affirmative negligent act or had been guilty of negligence by failing to do something which he should have done, and that, by reason of such negligence, appellant was injured.

I am in accord with the majority in holding that, under the authorities, the giving of instruction No. 8 constituted prejudicial error and justified the granting of respondent's motion for a new trial.

I also agree with the majority in holding that instructions Nos. 4 and 6 were erroneous and should not be given upon a second trial of the action.

STEINERT and SIMPSON, JJ., concur with BEALS, J.

HILL, J. (dissenting)—I find myself in disagreement with the majority on two questions: (A) When does the rule of *res ipsa loquitur* apply? and (B) What is its effect when it is applied?

(A) When does the rule of *res ipsa loquitur* apply?

The majority quotes the following from *Firebaugh v. Seattle Electric Co.*, 40 Wash. 658, 661, 82 Pac. 995, 111 Am. St. 990, 2 L. R. A. (N.S.) 836:

"It is insisted by the appellant that it is manifest that this court has not intended to announce the rule that there is a presumption of negligence *unless it is apparent that the accident could not have happened without negligence on the part of the carrier.* This is no doubt true, for the rule of *res ipsa loquitur* is based upon the apparent fact that the accident *could not have happened* without negligence on the part of the carrier; or, upon the literal meaning of the expression, that the thing itself speaks, and shows *prima facie* that the carrier was negligent." (Italics by the majority.)

And it then says:

"We are of the opinion that what we belive is the basic rule announced by Judge Dunbar, the writer of the opinion, in the *Firebaugh* case, *supra,* namely, that the doctrine of *res ipsa loquitur* is based on the apparent fact that the accident could not have happened without negligence on the part of the carrier, has never been receded from by the court. While different language may have been used in

some of the decisions, it is our opinion the rule as above announced is still the rule in this state."

I grant that we have frequently used the language which the majority approves, and we have said that the happening relied upon to make the *res ipsa loquitur* doctrine applicable must "be of such a character as, in the light of ordinary experience, is inexplicable except as the result of negligence." *De Yoe v. Seattle Electric Co.*, 53 Wash. 588, 594, 102 Pac. 446, 104 Pac. 647, 1133. This rule, now so explicitly adopted by the majority, renders the doctrine of *res ipsa loquitur* of no practical value to a plaintiff, is contrary to the great weight of authority, and is inconsistent with our own decisions where the doctrine has been applied.

I say "of no practical value to a plaintiff" because, if he must remove every possibility except negligence, he does not need the doctrine of *res ipsa loquitur*, as he has proved negligence. The majority is applying the criminal law rule relative to circumstantial evidence, *i.e.*, that it must be inconsistent with any hypothesis of innocence (or nonnegligence in this type of case).

This court has said that a plaintiff does not have to exclude every possible cause of a happening for which a defendant would not be liable, and that he is not required to prove negligence beyond a reasonable doubt. *Lang v. Puget Sound Nav. Co.*, 189 Wash. 353, 65 P. (2d) 1069. By the great weight of authority, the happening relied upon to invoke the doctrine of *res ipsa loquitur* need be neither inexplicable nor incapable of explanation except on the basis of negligence, and it is sufficient if the happening supports a permissible inference of negligence. The following is a much quoted statement by the supreme court of the United States on this point:

"In our opinion, *res ipsa loquitur* means that the facts of the occurrence warrant the inference of negligence, not that they compel such an inference; that they furnish circumstantial evidence of negligence where direct evidence of it may be lacking, but it is evidence to be weighed, not necessarily to be accepted as sufficient; that they call for explanation or rebuttal, not necessarily that they require it; that they make a case to be decided by the jury, not that they

forestall the verdict. *Res ipsa loquitur,* where it applies, does not convert the defendant's general issue into an affirmative defense. When all the evidence is in, the question for the jury is, whether the preponderance is with the plaintiff." *Sweeney v. Erving,* 228 U. S. 233, 240, 57 L. Ed. 815, 33 S. Ct. 416, Ann. Cas. 1914D, 905.

This court has twice quoted the foregoing excerpt from the *Sweeney* case (*Singer v. Metz Co.,* 107 Wash. 562, 567, 182 Pac. 614, 186 Pac. 327; *Genero v. Ewing,* 176 Wash. 78, 82, 28 P. (2d) 116), and has cited the case with approval on three other occasions (*Briglio v. Holt & Jeffery,* 85 Wash. 155, 159, 147 Pac. 877; *Kolbe v. Public Market Delivery & Transfer,* 130 Wash. 302, 305, 226 Pac. 1021; *Pacific Coast R. Co. v. American Mail Line,* 25 Wn. (2d) 809, 818, 172 P. (2d) 226).

The reason for this more liberal rule as to the application of the doctrine of *res ipsa loquitur* is well stated in *George Foltis, Inc. v. New York City,* 287 N. Y. 108, 115, 38 N. E. (2d) 455, 153 A. L. R. 1122, quoting from *Galbraith v. Busch,* 267 N. Y. 230, 234, 196 N. E. 36:

" 'The doctrine of *res ipsa loquitur* is not an arbitrary rule. It is rather a common-sense appraisal of the probative value of circumstantial evidence. It requires evidence which shows at least probability that a particular accident could not have occurred without legal wrong by the defendant. To negative every possibility that the accident occurred in some extraordinary manner which would exculpate the defendant is often impossible. In the administration of the law we must be satisfied with proof which leads to a conclusion with probable certainty where absolute logical certainty is impossible.' "

It is generally recognized in *res ipsa loquitur* cases that a permissible inference of negligence makes a *prima facie* case. In *McCoy v. Courtney,* 25 Wn. (2d) 956, 962, 172 P. (2d) 596, 170 A. L. R. 603, we defined a *prima facie* case as one

" . . . where the evidence is sufficient to justify, but not to compel, an inference of liability, or, in other words, evidence to be weighed, but not necessarily to be accepted, by a jury or other trier of the fact. *Vance v. Guy,* 224 N. C. 607, 31 S. E. (2d) 766."

The general rule is that, while the doctrine of *res ipsa loquitur* will get a plaintiff past a nonsuit, it does not compel a directed verdict in his favor if the defendant elects to introduce no evidence, because, as stated in *McCoy v. Courtney, supra,* there is "evidence to be weighed, but not necessarily to be accepted." Under the Washington rule as the majority now announces it, there must of necessity be a directed verdict for the plaintiff in any *res ipsa loquitur* case if the defendant introduces no evidence, because, if the doctrine is applied only where the happening is incapable of explanation except on the basis of negligence, the defendant must of course, in the absence of exculpatory evidence, be held to have been negligent.

We have ourselves applied the liberal rule in numerous cases.

In *Mahlum v. Seattle School Dist. No. 1,* 21 Wn. (2d) 89, 97, 149 P. (2d) 918, we said:

"We are also of the opinion that the evidence was sufficient to permit submission of the case to the jury on the theory of *res ipsa loquitur.* The rationale of that doctrine is that, when the thing which causes the injury is shown to be under the management of the defendant or his servants, and the accident is such as in the ordinary course of events does not happen if those who have the management use proper care, it affords reasonable evidence, in the absence of explanation by the defendant, that the accident arose from want of care. *Poth v. Dexter Horton Estate,* 140 Wash. 272, 248 Pac. 374; *Highland v. Wilsonian Inv. Co.,* 171 Wash. 34, 17 P. (2d) 631.

"The pressure cooker was under the management of the appellant. Explosions of such instrumentalities do not, in the ordinary course of things, occur if those in charge of them use reasonable care, for, otherwise, it is quite unlikely that such devices would long be upon the market or in popular use. In this instance, the explosion did occur. The occurrence therefore afforded reasonable evidence, in the absence of explanation by the appellant, that the accident arose from want of care."

In *Hardman v. Younkers,* 15 Wn. (2d) 483, 489, 131 P. (2d) 177, 151 A. L. R. 868, we said:

"Ordinarily, the mere fact that an automobile accident has occurred is not of itself proof of negligence on the part

of the driver. However, under the doctrine of *res ipsa loquitur*, when an accident or injury is such as in the ordinary course of events does not happen if the person in charge of the motor vehicle uses proper care, proof of the occurrence of an injury and the circumstances surrounding it may, in the absence of contrary evidence, give rise to an inference of negligence on the part of the driver of the offending vehicle and thus make out a *prima facie* case of negligence against such driver, placing upon him the burden of explaining the accident and showing that it did not occur through want of care on his part."

In *Highland v. Wilsonian Inv. Co.*, 171 Wash. 34, 38, 17 P. (2d) 631, we approved the rule that:

" 'When a thing which causes injury is shown to be under the management of the defendant, and the accident is such as in the ordinary course of things does not happen, if those who have the management use proper care, it affords reasonable evidence, in the absence of explanation by the defendant, that the accident arose from a want of care.' 1 Shearman & Redfield on Negligence (6th ed.), § 59."

In *Wodnik v. Luna Park Amusement Co.*, 69 Wash. 638, 641, 125 Pac. 941, 42 L. R. A. (N.S.) 1070, we used exactly the same quotation from Shearman & Redfield that we quoted in the *Highland* case, *supra*; and we also quoted the following from *Graaf v. Vulcan Iron Works*, 59 Wash. 325, 328, 109 Pac. 1016:

"The doctrine of *res ipsa loquitur* means that the jury, from their experience and observation as men, are warranted in finding that an accident of this kind does not ordinarily happen except in consequence of negligence. As was said in *Griffin v. Boston & Albany R. Co.*, 148 Mass. 143, 19 N. E. 166, 12 Am. St. 526, 1 L. R. A. 698:
" 'All that the plaintiff upon this branch of his case was required to do was to make it appear to be more probable that the injury came in whole or in part from the defendant's negligence than from any other cause.' "

In *Anderson v. McCarthy Dry Goods Co.*, 49 Wash. 398, 401, 95 Pac. 325, 126 Am. St. 870, 16 L. R. A. (N.S.) 931, which was an action to recover damages caused by the falling of a basket from an overhead carrier system in defendant's store, we said:

"When a plaintiff proves the existence of this carrier system and the falling of the basket therefrom, causing damage, we think facts are shown from which a reasonable mind might properly infer that the apparatus was improperly constructed or out of repair. Hence, a case for the jury is thus established."

The plaintiffs recovered in all of the Washington cases from which I have just quoted, and yet, if we had applied the rule now adopted by the majority, the principle of *res ipsa loquitur* would not have been applicable, because there were apparent explanations apart from negligence, as there is when a car stops with an extraordinarily violent jerk or jolt. In the *Mahlum* case, for example, a pressure cooker used in a school lunchroom exploded. The explosion could have been due to fault or fatigue in the metal not visible or apparent, for which there would have been no liability. We nevertheless properly applied the doctrine of *res ipsa loquitur*.

The quotation from *Morner v. Union Pac. R. Co.*, 31 Wn. (2d) 282, 196 P. (2d) 744, appearing in the majority opinion on page 784, states the correct rule and is inconsistent with the rule which the majority announces in this case.

It is, however, when we consider the carrier cases (and this is such a case) that the majority's departure from the generally recognized concept of *res ipsa loquitur* becomes most apparent. In *Firebaugh v. Seattle Electric Co., supra,* the very case from which the majority quotes the rule it says is applicable here, it is explicitly stated that that rule does not apply to carrier cases.

An analysis of the *Firebaugh* case will show that the language quoted by the majority is not the principle applied in the determination of that case. The court's holding in that case is well stated in the first headnote:

"Where an accident to a passenger on a street car is due to an explosion or blow-out of the controller, a presumption of negligence on the part of the carrier arises, since the doctrine of *res ipsa loquitur* applies where the accident is due to equipment or operation over which the carrier had entire control."

The cause of the explosion or blowout in the *Firebaugh* case could not be definitely established, and several causes were suggested. It was held that the doctrine of *res ipsa loquitur* applied and that there was a presumption of negligence from the happening.

Preceding the *Firebaugh* case and, in fact, beginning with *Hawkins v. Front Street Cable R. Co.*, 3 Wash. 592, 28 Pac. 1021, 28 Am. St. 72, 16 L. R. A. 808, decided in 1892, we have, in carrier cases, pretty consistently followed the rule laid down in *Meier v. Pennsylvania R. Co.*, 64 Pa. St. 225, 3 Am. Rep. 581, that the doctrine of *res ipsa loquitur* applies when injury to a passenger could have been caused (1) by a defect in its road, cars, or machinery, or (2) by a want of diligence or care by its employees, or (3) by any other thing which the carrier could or ought to control as part of its duty to carry its passengers safely. (A new trial was awarded in the *Hawkins* case because the jury had been instructed that, when a passenger is injured without fault of his own, there is a legal presumption of negligence on the part of the carrier, which instruction was much too broad.)

In *Williams v. Spokane Falls & Northern R. Co.*, 39 Wash. 77, 82, 80 Pac. 1100, the *Hawkins* case was distinguished, the court saying:

"There, it will be observed, the instruction overruled had no limitations whatever, and, under that instruction, if the passenger had been injured by some unavoidable accident disconnected entirely from the railroad company, such as an injury resulting from the discharge of a firearm by some one in the car, or through the window by some one outside of the car, the company would have been held responsible. So that it is not enough that the passenger is injured without fault of his own, but the injury must be connected in some way with the operation of the road; and, when the injury is so connected, we think, under the overwhelming weight of authority, that a *prima facie* case of negligence is made out by the plaintiff, and that the duty devolves upon the company to establish a want of negligence on its part. And the cases cited by this court in that case show that such was the view that the court took of the law."

The court then said that Mr. Thompson, in his Commentaries on the Law of Negligence, "very happily expresses the distinction which we have sought to make," and quoted § 2754 of that text, a portion of which we also quote:

" 'In every action by a passenger against a carrier to recover damages predicated upon the negligence or misconduct of the latter, the burden of proof, in the first instance, is, of course, upon the plaintiff to connect the defendant in some way with the injury for which he claims damages. But when the plaintiff has sustained and discharged this burden of proof by showing that the injury arose in consequence of the failure, in some respect or other, of the carrier's means of transportation, or the conduct of the carrier's servants, then, in conformity with the maxim *res ipsa loquitur,* a presumption arises of negligence on the part of the carrier or his servants, which, unless rebutted by him *to the satisfaction of the jury,* will authorize a verdict and judgment against him for the resulting damages.' "

The court pointed out that the presumption arises, not from the happening of an accident, but from a consideration of the cause of the accident, and to make that clear quoted part of § 2756 from the same text:

" 'It has been pointed out by an able judge that the presumption which arises in these cases does not arise from the mere fact of the injury, but *from a consideration of the cause of the injury.* Thus, it was said by Ruggles, J.: "A passenger's leg is broken while on his passage in the railroad car. This mere fact is no evidence of negligence on the part of the carrier, until something further be shown. If the witness who swears to the injury testifies also that it was caused by a crash in a collision with another train of cars belonging to the same carriers, the presumption of negligence immediately arises,—not, however, from the fact that the leg was broken, but from the circumstances attending the fact." ' "

In *Hayes v. Staples,* 129 Wash. 436, 438, 225 Pac. 417, we said:

"The rule is general that a plaintiff makes out a *prima facie* case of negligence against a common carrier when he shows that he was injured while riding for hire and in the usual manner on a conveyance furnished by the carrier, and that the injury was caused by some defect in or man-

agement of the conveyance over which the carrier had exclusive control. It is not necessary to go beyond our own decisions to find authority for the rule. In a long line of cases we have so held. *Williams v. Spokane Falls & N. R. Co.*, 39 Wash. 77, 80 Pac. 1100; *Firebaugh v. Seattle Elec. Co.*, 40 Wash. 658, 82 Pac. 995, 111 Am. St. 990, 2 L. R. A. (N. S.) 836; *Jordan v. Seattle, Renton etc. R. Co.*, 47 Wash. 503, 92 Pac. 284; *Russell v. Seattle, Renton etc. R. Co.*, 47 Wash. 500, 92 Pac. 288; *Harris v. Puget Sound Elec. R.*, 52 Wash. 289, 100 Pac. 838; *Topping v. Great Northern R. Co.*, 81 Wash. 166, 142 Pac. 425, L. R. A. 1915F 1174, 7 N. C. C. A. 507.

"The presumption of negligence arising from such proofs is not, of course, conclusive. It is open to the carrier to show that the accident was not the result of negligence, and he is always entitled to have the verdict of the trier of fact on the question when he makes such a showing."

In *Cassels v. Seattle*, 195 Wash. 433, 438, 81 P. (2d) 275, we laid down the oft-repeated rule:

"To support a claim for damages occasioned by jerks and jolts on a street car, there must be evidence that the facts and circumstances surrounding the injury show negligence. *Wile v. Northern Pac. R. Co.*, 72 Wash. 82, 129 Pac. 889; Annotations, 29 L. R. A. (N. S.) 814. It is, however, actionable negligence to cause a street car to give a violent or unusual jolt causing injury to a passenger. *Laible v. Wells*, 317 Mo. 141, 296 S. W. 428; *Bales v. Kansas City Public Service Co.*, 328 Mo. 171, 40 S. W. (2d) 665."

While the court did not there take the time to spell it out, it is apparent that the reason a violent or unusual jolt is actionable negligence, is that there is an inference of negligence from the happening itself. The jolt may have been necessary to prevent running over a child, and no one would contend that it could not have happened without negligence; yet the happening raises a permissible inference of negligence which will take such a case to the jury.

In *Wiggins v. North Coast Transp. Co.*, 2 Wn. (2d) 446, 453, 98 P. (2d) 675, we said:

"The ordinary jolts and jerks of the bus in starting or stopping are among the usual incidents of travel; and for injuries resulting from them, the carrier is not liable. The

sudden stopping of the vehicle is not of itself evidence of negligence, but the vehicle may be stopped so suddenly as to furnish evidence of negligence.

" 'In general, no fixed rule can be laid down as to what constitutes such a sudden or abrupt stopping of a bus as to give rise to an inference of negligence; each case being determinable upon the particular facts shown and presenting a question of fact.' 4 Blashfield, Cyc. of Automobile Law, 17, § 2156."

At the risk of being unduly repetitious, I again point out that a sudden stop may be necessary to save a life, yet from the fact of that sudden stop there rises an inference of negligence such as Blashfield refers to in the foregoing quotation and which we specifically recognize.

In *Keller v. Seattle,* 200 Wash. 573, 94 P. (2d) 184, the court carefully analyzed the testimony and came to the conclusion that the evidence was sufficient to take to the jury the question of whether the jerk causing the accident was so much out of the ordinary that, unexplained, it raised the inference that the operator of the streetcar was guilty of negligence. The case was sent back for a retrial because of a clearly erroneous instruction which told the jury that, if the plaintiff was a passenger and was injured by virtue of the manner in which the car was operated, there was a presumption of negligence; whereas, as we have seen in the jolt, jerk, and stop cases, there is no such presumption or inference from ordinary jerks, jolts, or stops.

In the case now before the court, the majority says that there was sufficient evidence

" . . . to take the case to the jury on the theory that the operator of the bus was guilty of negligence in making this stop in the manner and place he did, there not appearing to have been any necessity for making an emergency stop. . . ."

Note this very significant language immediately following the foregoing quotation from the majority opinion:

"However, when the city introduced proof to the effect that it became necessary to make the sudden stop because of the fact that a car had cut across directly in front of the bus, the case should have been submitted to the jury on the

issue raised by the *evidence* of appellant and that presented by respondent." (Italics by the majority.)

Why did the city need to introduce proof of necessity to make the sudden stop? Obviously, as the majority says:

" . . . on the theory that the operator of the bus was guilty of negligence in making this stop in the manner and place he did. . . ."

The passenger did not have to show that there was no cause for the sudden stop; the responsibility for explanation or excuse was on the city. What the majority refers to as a "theory" was in fact the application of the doctrine of *res ipsa loquitur.*

I can see only one explanation of our holding in the *Keller* case and in this case, that the evidence of the extraordinary character of the jolt, jerk, or stop was sufficient to take the cases to the jury, and our insistence that they are not *res ipsa loquitur* cases; and that explanation is that this court recognizes a distinction between the inference of negligence which arises from an unusual and extraordinary jolt, jerk, or stop and the doctrine of *res ipsa loquitur.* In my opinion, such a distinction amounts to no more than an allergy to the phrase *"res ipsa loquitur."*

If it is our purpose to recognize a permissible inference of negligence in such cases, but to say that *res ipsa loquitur* applies only where the jolt, jerk, or sudden stop could not have happened without negligence, then appellant's grievous error was to mislabel instruction No. 8 as a *res ipsa loquitur* instruction; whereas, in truth and fact, the first paragraph of the instruction simply presented to the jury the question of whether the stopping of the bus was of such a character as to raise an inference of negligence, and I quote it:

"IF YOU FIND from the evidence that the fact that the manner of the stopping of the bus was of such a nature as would not, in the ordinary course of events, happen if those who had the control, supervision and operation thereof had used proper and reasonable care, then I instruct you that you may infer from the fact that such a stop was made was due to the negligence of the defendant, and a *prima facie* case is thereby established in favor of the plaintiff."

Since this paragraph of the instruction deals only with the inference of negligence which may arise from the stopping of a bus in such a manner

". . . as would not, in the ordinary course of events, happen if those who had the control, supervision and operation thereof had used proper and reasonable care . . . ,"

it is entirely consistent with our holdings in the *Wiggins* and *Keller* cases and the present case. Therefore, the vice which made the giving of this instruction erroneous must be in the second paragraph thereof, which reads as follows:

"The burden then devolves upon the defendant to furnish an explanation or rebuttal of such *prima facie* case by producing evidence of due care and precaution under the circumstances and conditions necessarily within defendant's exclusive control. If, then, after considering such explanations of the whole case, and of all the issues as to negligence, injury and damages, the evidence still preponderates in favor of the plaintiff, then plaintiff is entitled to recover; otherwise not."

We now turn our attention to a consideration of the effect of raising an inference of negligence.

(B) What is the effect of the doctrine of *res ipsa loquitur* when it is applicable? Or, as the majority would apparently prefer to state the question: What is the effect of the inference of negligence from the extraordinary jolt, jerk, or stop which establishes a *prima facie* case in a carrier case?

It may be that the majority would agree, if this were a *res ipsa loquitur* case, that the second paragraph of instruction No. 8, which I have just quoted, was a proper instruction. However, I have not established my position that it was a proper instruction until I show that the second paragraph correctly states the law in a *res ipsa loquitur* case; and I do not know just what interpretation to place upon the following paragraph, in which the majority states its conclusion:

"We are of the opinion that, in the instant case, the demands of justice do not require, nor do the circumstances surrounding this stop justify, an instruction on the doctrine of *res ipsa loquitur*. In other words, we are of the opinion that the evidence introduced by appellant does not show that

the accident was of such a character that it *could not have happened without negligence on the part of the operator of the bus.* We are of the opinion, however, that there was sufficient *evidence* introduced on the part of appellant to take the case to the jury on the theory that the operator of the bus was guilty of negligence in making this stop in the manner and place he did, there not appearing to have been any necessity for making an emergency stop. However, when the city introduced proof to the effect that it became necessary to make the sudden stop because of the fact that a car had cut across directly in front of the bus, the case should have been submitted to the jury on the issue raised by the *evidence* of appellant and that presented by respondent." (Italics by the majority.)

There are certain possibilities. (1) If the second *"evidence"* in the foregoing statement refers to the evidence on the issue of whether a car cut in front of the bus, the statement is erroneous (or so I believe). (2) If it refers to all the evidence in the case, but with the intent to exclude thereby from the consideration of the jury, the inference of negligence arising from the sudden stop ("the theory that the operator of the bus was guilty of negligence in making this stop in the manner and place he did"), the statement is erroneous (or so I believe). (3) If it refers to all the evidence and does not exclude the permissible inference of negligence arising from the sudden stop, then the statement is correct; but, in that event, the majority concedes that this is a *res ipsa loquitur* case, unless, as I have previously pointed out, it makes a distinction between the inference of negligence which arises from an unusual jolt, jerk, or stop, and the doctrine of *res ipsa loquitur*.

Proceeding on the theory that the majority means either (1) or (2), *supra,* we must now give consideration to the effect of the application of the doctrine of *res ipsa loquitur*.

If the doctrine of *res ipsa loquitur* results in a true presumption, or a presumption of law, the carrier, being presumptively negligent, is liable (assuming there was no contributory negligence), and an instructed verdict for the plaintiff is in order unless the carrier introduces exculpatory evidence. However, if the carrier does introduce credi-

ble evidence to establish that it was not negligent, the presumption disappears from the case, for, as has been said:

"A presumption is not evidence of anything, and only relates to a rule of law as to which party shall go forward and produce evidence sustaining a matter in issue. A presumption will serve as and in the place of evidence in favor of one party or the other until prima facie evidence has been adduced by the opposite party; but the presumption should never be placed in the scale to be weighed as evidence. The presumption, when the opposite party has produced prima facie evidence, has spent its force and served its purpose, and the party then, in whose favor the presumption operated, must meet his opponent's prima facie evidence with evidence, and not presumptions. A presumption is not evidence of a fact, but purely a conclusion. Elliott, Ev. §§ 91, 92, 93; Wigmore, Ev. §§ 2490, 2491." *Peters v. Lohr,* 24 S. D. 605, 609, 124 N. W. 853.

The foregoing statement has been quoted in whole or in part at least eight times in this state between *Scarpelli v. Washington Water Power Co.,* 63 Wash. 18, 114 Pac. 870, and *Kay v. Occidental Life Ins. Co.,* 28 Wn. (2d) 300, 183 P. (2d) 181. And I again take space in our reports to repeat what we have said so many times, because at this point it helps to clarify the distinction between the effect of a presumption of law and the effect of a permissible inference, or presumption of fact.

It is the respondent's position in this case, and apparently that of the majority, that, when the city introduced its exculpatory evidence, the inference of negligence disappeared from the case. If, however, the doctrine of *res ipsa loquitur* results in a permissible inference of negligence, the great weight of authority is that the failure of the carrier to introduce any exculpatory evidence means that the inference of negligence carries the case to the jury. The jury may or may not conclude that there was negligence, but there can be no directed verdict for the plaintiff, except in very exceptional cases hereinafter referred to. If the defendant does introduce evidence to establish that it was not negligent, the permissible inference continues in the case for what it may be worth, except again in very exceptional

cases hereinafter referred to. We again call attention to the language of the supreme court of the United States in *Sweeney v. Erving,* 228 U. S. 233, 240, 57 L. Ed. 815, 33 S. Ct. 416, Ann. Cas. 1914D, 905, which we have expressly adopted:

"In our opinion, *res ipsa loquitur* means that the facts of the occurrence warrant the inference of negligence, not that they compel such an inference; that they furnish circumstantial evidence of negligence where direct evidence of it may be lacking, but it is evidence to be weighed, not necessarily to be accepted as sufficient; that they call for explanation or rebuttal, not necessarily that they require it; that they make a case to be decided by the jury, not that they forestall the verdict. *Res ipsa loquitur,* where it applies, does not convert the defendant's general issue into an affirmative defense. When all the evidence is in, the question for the jury is, whether the preponderance is with the plaintiff."

See *Singer v. Metz Co.,* 107 Wash. 562, 182 Pac. 614, 186 Pac. 327.

It is sometimes difficult to tell which of the two theories has been adopted by a given state. The following statement concerning the situation in the state of New York, taken from *George Foltis, Inc., v. New York City,* 287 N. Y. 108, 121, 38 N. E. (2d) 455, 153 A. L. R. 1122, is applicable to many other jurisdictions:

"A study of the opinions of the appellate courts of this state reveals that judges have used the terms 'inference' and 'presumption' indiscriminately and without recognition that an 'inference' and a 'presumption' are not identical in scope or effect. Judicial failure to note the distinction has led to confusion of thought and often to inconsistencies in judicial opinions and decisions. [Citing cases.] It is perhaps impossible for trial judges to deduce from the opinions or decisions of the appellate court the procedure they should follow when under the rule of *res ipsa loquitur* the plaintiff has established *prima facie* that injury was due to the negligence of the defendant and the defendant introduces no evidence in rebuttal. (See Rosenthal, 'Procedural Effect of Res Ipsa Loquitur,' 22 Cornell Law Quarterly [1936], p. 39.) . . . The time has come to attempt authoritative formulation of the procedural rule, confused in

this state as in other jurisdictions by earlier failure to appreciate fully the implications latent in the rule of *res ipsa loquitur*."

It has long been Professor Wigmore's thesis that a presumption of fact is not a presumption at all, but an inference. He says:

"There is in truth but one kind of presumption; and the term 'presumption of fact' should be discarded as useless and confusing." 9 Wigmore on Evidence (3d ed.) 289, § 2491.

After a careful consideration of the arguments of Professors Thayer and Wigmore on this subject, and of their numerous critics, particularly Professor Morgan and Mark Shain, and of the cases discussed in the annotations in 53 A. L. R. 1494 and 167 A. L. R. 658, it seems to me that the term "permissible inference of negligence" is preferable, as eliminating confusion. In support of that position I quote two very persuasive opinions, the first by Chief Justice Marshall of the supreme court of Ohio, in *Glowacki v. North Western Ohio R. & Power Co.*, 116 Ohio 451, 458, 157 N. E. 21, 53 A. L. R. 1486:

"The doctrine of *res ipsa loquitur* involves a rule of considerable difficulty, and has become involved in much contradiction in the courts of various jurisdictions, and the former decisions of this court are not entirely free from contradiction. The difficulty has arisen in part in a confusion of terms and a failure to draw the proper distinction between presumptions and inferences. It will be found that the more carefully considered opinions of this and other courts have avoided treating the rule as a presumption. The distinction between an inference and a presumption is well stated by Judge Wilkin in *Ensel v. Lumber Ins. Co.*, 88 Ohio St., 269, 102 N. E., 955, at page 282 of the opinion, (102 N. E., 959) which we quote:

" 'The error of counsel throughout this case, lies in a confusion of terms. They mistake inference for presumption— a slip too often unconsciously made by judges as well as lawyers. A presumption is a rule which the law makes upon a given state of facts; an inference is a conclusion which, by means of data founded upon common experience, natural reason draws from facts which are proven.' "

The other is from *Johnson v. Stevens Bldg. Catering Co.,* 323 Ill. App. 212, 218, 55 N. E. (2d) 550:

"While it has been said in some Illinois cases that the presumption of negligence raised by the application of the doctrine of *res ipsa loquitur* is not absolute or conclusive but is rebuttable and vanishes entirely when any evidence appears to the contrary, it seems to us that where the doctrine is applicable the use of the term 'presumption of negligence' is an inapt and unfortunate characterization of the prima facie case made out by the fact of the injury itself and the circumstances attending it. Of course such a prima facie case is neither absolute nor conclusive but to say that it 'vanishes entirely when any evidence appears to the contrary' is equivalent to holding that, regardless of how flimsy the explanation offered by a defendant may be as to its exercise of due care in connection with the instrumentality that caused the injury and regardless of the incredibility and improbability of the explanation, such explanation must be accepted as true. If that were the correct rule a plaintiff could never recover under the principle of *res ipsa loquitur,* if a defendant offered any evidence by way of explanation of due care on his part, no matter how incredible and improbable such evidence might be. A prima facie case cannot vanish but must be submitted to the jury together with the evidence presented by the defendant. It is the province of the jury to determine as a question of fact whether the evidence introduced by a defendant in explanation of the occurrence is consistent with due care on his part and to also determine the credibility and probability of such evidence."

We have, in this state, used the terms "inference of negligence" and "presumption of negligence" almost interchangeably; but when we have said "presumption of negligence" in *res ipsa loquitur* cases, it has, in almost every instance, been with a recognition that we were referring to a presumption of fact and not a presumption of law, and that a presumption of fact does not disappear when credible controverting evidence is introduced.

In *Briglio v. Holt & Jeffery,* 85 Wash. 155, 147 Pac. 877, the court made clear that the presumption of negligence raised in a *res ipsa loquitur* case is a presumption of fact, not a presumption of law. It was also there made clear that,

as a presumption of fact, it does not cease to exist. The court stated the meaning of the doctrine of *res ipsa loquitur* in these words:

"But in such a case, what is really meant is simply that the burden of furnishing evidence explaining the apparent negligence, if any explanation is possible, is upon the one to whom it is attributable. The doctrine means that the facts of the occurrence warrant an inference of negligence; not that they compel such an inference. It does not shift the burden of proof, nor does it convert the defendant's general issue into an affirmative defense. When all the evidence is in, it is for the jury to determine whether the preponderance is with the plaintiff."

It then made equally clear its view of the effect of the application of the doctrine:

"The proper instructions as to the application of the presumption would be thus: The jury should be instructed that the burden of proof is upon the plaintiff to establish all the controverted allegations of his complaint by a fair preponderance of the evidence, and defining preponderance of the evidence; that when a situation is shown which necessarily infers negligence on the part of defendant, or *res ipsa loquitur, the burden then devolves upon defendant to furnish an explanation or rebuttal of that presumption of negligence, by producing evidence of his due care and proper precaution, under the circumstances and conditions necessarily within defendant's exclusive control. If then, after considering such explanation, on the whole case and on all the issues as to negligence, injury and damages, the evidence still preponderates in favor of the plaintiff, plaintiff is entitled to recover; otherwise not."* (Italics mine.)

The foregoing "proper instructions" in a *res ipsa loquitur* case are, in my opinion, an excellent statement, if two propositions are kept in mind: (1) that when the term "presumption of negligence" is used, the court is referring to a presumption of fact, which remains in the case, and not a presumption of law, which can disappear from the case (and that "inference of negligence" would be a more accurate expression); and (2) that the words "situation . . . which necessarily infers negligence" do not mean that the situation need be one from which it is necessary

(compulsory) to infer negligence (which is the position of the majority in the present case), but that the situation need be one from which negligence necessarily may be inferred (which is my position in the present case). That there may be no question of the meaning of the court when it used the quoted language, I repeat a portion of the first quotation from the case:

" . . . The doctrine means that the facts of the occurrence warrant an inference of negligence; not that they compel such an inference. . . ."

These "proper instructions" have been quoted three times and cited many times by this court. They were quoted and approved in *Genero v. Ewing,* 176 Wash. 78, 82, 28 P. (2d) 116, and *Kolbe v. Public Market Delivery & Transfer,* 130 Wash. 302, 306, 226 Pac. 1021, and, more recently, in *Hardman v. Younkers,* 15 Wn. (2d) 483, 493, 131 P. (2d) 177, in which we also said:

"Although a plaintiff may have made a *prima facie* case of negligence through the application of the doctrine of *res ipsa loquitur,* he still has the burden of proof or, as is sometimes expressed, the burden of making the better case, upon that issue when finally submitted to the trier of the fact. In such situations, the only 'burden' resting upon the defendant is simply that of going forward with the evidence at the proper time, furnishing an explanation of how the accident happened and showing that it did not occur by reason of lack of due care on his part. When the defendant has done that, the whole case must be submitted to the trier of the fact, whose duty then is to determine whether the plaintiff has established negligence, injury, and damages, by a preponderance of the evidence."

The italicized portion of the instructions quoted above from the *Briglio* case, deals with the effect of the application of the doctrine of *res ipsa loquitur. It is the exact language of the second paragraph of instruction No. 8 in the present case, with the exception that, for the words "rebuttal of that presumption of negligence," the trial court substituted "rebuttal of such prima facie case."* We again quote our definition of a *prima facie* case:

"A *'prima facie* case' is one where the evidence is suffi-
cient to justify, but not to compel, an inference of liability,
or, in other words, evidence to be weighed, but not neces-
sarily to be accepted, by a jury or other trier of the fact."
*McCoy v. Courtney*, 25 Wn. (2d) 956, 962, 172 P. (2d) 596.

It seems to me incontrovertible that in the present in-
stance the "whole case," including the right to draw an
inference of negligence, was properly submitted to the jury
under instructions which we have heretofore frequently
approved.

The respondent here, upholding the granting of a new
trial, has led the trial court and this court into error by
blandly assuming that the presumption of negligence (more
properly "inference of negligence") arising from the sudden
stop, is a presumption of law that is removed by the positive
testimony of disinterested witnesses. If we are to use the
confusing phrase "presumption of negligence," we should
keep in mind that it is a presumption of fact that remains
in the case unless the evidence is so conclusive that there
was no negligence that reasonable minds cannot disagree
and it ceases to be a jury question. (That is almost the
present case, but not quite. Respondent says the testimony
regarding the presence of a third vehicle which caused the
sudden stop, which would negative negligence on the part
of the respondent, is "all but conclusive," and the major-
ity says it is "almost conclusive." That it is not conclu-
sive enough is evidenced by the fact that the trial court
granted a new trial and this court approves a new trial.
If it were really conclusive, a dismissal, not a new trial,
should be granted.)

To summarize my position:

When you have a case which warrants the application of
the doctrine of *res ipsa loquitur*, the permissible inference
of negligence which must be present should go to the jury
for what it may be worth, along with the exculpatory evi-
dence which the defendant presents. The weight of that
inference will vary according to the circumstances of each
individual case. Generally speaking, it makes a *prima facie*
case, as we have heretofore defined that term, and will get

a plaintiff past a nonsuit, but it will not support a directed verdict in his favor. When the defendant puts in exculpatory evidence, it may *overcome* that inference of negligence, but it does not make it disappear.

To state the proposition a little differently, I quote the words of the supreme court of Oregon in *Chaperon v. Portland Electric Co.*, 41 Ore. 39, 47, 67 Pac. 928, where the effect of the defendant's evidence on a plaintiff's *prima facie* case was considered:

"When the defendant produced its evidence, the case rested; and it became a matter for the jury to determine whether it had succeeded, or whether, notwithstanding its attempt at exoneration, plaintiff's *prima facie* case was even yet the stronger and more satisfactory."

This court said substantially the same thing in *Mahlum v. Seattle School Dist. No. 1*, 21 Wn. (2d) 89, 149 P. (2d) 918.

There are two exceptions to what I have stated to be my conception of the effect of the application of the doctrine of *res ipsa loquitur*, one at each end of the scale, so to speak:

(1) Where the inference of negligence is so strong that, in the absence of explanation by the defendant, reasonable minds cannot reach any conclusion but that the defendant must have been negligent. A collision by trains or cars of a carrier on tracks under the exclusive control of that carrier would seem to present such a case. It was conceded by the carrier in *Russell v. Seattle, Renton & Southern R. Co.*, 47 Wash. 500, 92 Pac. 288, and *Jordan v. Seattle, Renton & Southern R. Co.*, 47 Wash. 503, 506, 92 Pac. 284, that

" ' . . . ordinarily when a collision occurs between two of the cars of a railway company the happening of such collision raises a presumption of negligence on the part of the railway company, which it is necessary for it to overcome in order to escape liability for injury sustained in such collision.' "

That is to say, ordinarily the inference of negligence in such a case is so conclusive that reasonable minds cannot differ and, unless the carrier chooses to introduce exculpatory evidence, the plaintiff is entitled to a directed verdict. It is this exception to the general rule that the majority says

should represent the situation before the doctrine of *res ipsa loquitur* can be invoked.

(2) Where the exculpatory evidence of the defendant is uncontradicted and is of such character that reasonable minds can reach no conclusion but that the defendant was not negligent. Under such circumstances, the trial court would be justified in taking that issue from the jury. *Scarpelli v. Washington Water Power Co.,* 63 Wash. 18, 114 Pac. 870; *Topping v. Great Northern R. Co.,* 81 Wash. 166, 142 Pac. 425, L. R. A. 1915F 1174; *Hayes v. Staples,* 129 Wash. 436, 225 Pac. 417. (There is language in the opinion in the *Topping* case which would indicate that it was decided on the basis that it was not a *res ipsa loquitur* case; but I believe that, as indicated in *Hayes v. Staples, supra,* it was a *res ipsa loquitur* case in which the defendant's evidence was so conclusive that the happening relied upon to furnish an inference of negligence was an act of God, that the trial court was justified in dismissing the case.)

As I have indicated, this is *almost* a case where the second exception might be invoked. Since the exculpatory evidence is not conclusive, however, the general rules above set out are applicable.

It is, therefore, my view that, if the majority means either of the first two possibilities pointed out in this dissent on page 805, it is wrong in its statement of the applicable rule; if it means the third, it is wrong in its conclusion that this is not a *res ipsa loquitur* case. Instruction No. 8 was a correct statement of the law, and this is the type of case in which it should be given; and the trial court erred when it granted a new trial "solely for the reason and upon the grounds that an error was committed by the Court in submitting" an instruction on *res ipsa loquitur*.

The majority also holds that the trial court erred in giving instructions Nos. 4 and 6; and I can agree that neither instruction should have been given, and that, since the case is to be tried again, this court should point out why they should not be given on a retrial; but I do not agree that they were sufficiently prejudicial to have warranted a new

trial if we had held that the *res ipsa loquitur* instruction was properly given.

The trial court commenced instruction No. 4 with the words:

"THE LAW REQUIRES that a trolley coach operator must drive at all times with a much greater care for his passengers' safety than must the driver of a private car."

Later in the same instruction, the proper test was given, that the operator must drive with the highest degree of care for the safety of his passengers consistent with the practical operation of a trolley coach. The quoted sentence was argumentative and invited a juror who might be an extremely cautious driver to envision an even higher degree of care on the part of the trolley coach operator. However, I cannot believe that it was prejudicial, in view of the fact that the court three times laid down the test of the trolley coach operator's conduct as being the highest degree of care compatible with practical operation of the coach.

Instruction No. 6 stated that a trolley coach operator is bound to assume, in driving his coach, that he may at any time be confronted with the necessity of making an emergency stop in traffic, and that he is bound to drive at such speed and with such control that, if confronted with an emergency, he can apply his brakes without unreasonable danger to his passengers. This instruction, the majority points out, imposed too strict a duty upon the operator, because it did not make clear that the operator would have the right to assume, until he knew or should have known to the contrary, that the other users of the highway would observe the rules of the road. That element might well have been included in the instruction complained of, but there was no prejudice to respondent, as another instruction told the jury that, if the operator, through no negligence on his part, was compelled to slow down or stop suddenly to avoid a collision with another vehicle, then the operator was not guilty of negligence.

In my opinion, there is no basis for a new trial on any of the grounds urged by the respondent, and the order granting a new trial should be set aside and the trial court instructed to enter a judgment on the verdict of the jury.

MALLERY and GRADY, JJ., concur with HILL, J.

[1] Reported in 207 P. (2d) 667.